Henry W. Ohlendorf, Receiver of Illinois State Bank
of Crete, Defendant in Error, v. Louis Rathje
et al., Plaintiffs in Error.

Gen. No. 7,061.

1. BANKING—*director liable for loss from his own defalcation
as cashier.* A bank director who was also cashier and in such
capacity embezzled large sums from the bank is liable, on the
bank's insolvency, for the losses sustained, as for negligence in
the discharge of his duties as director.

2. BANKING—*knowledge of embezzlement by cashier as fixing
director's liability for loss.* A bank director is shown to have
been negligent in the discharge of his duties so as to charge him
with liability for the loss sustained by the bank which was forced
into insolvency by the embezzlement and defalcation of the cashier,
a son of such director, where it is admitted by him that he had
knowledge of the son's acts long prior to the date of insolvency,
that he furnished the son with a large sum of money to make up
a shortage, and that he concealed his knowledge from the other
directors, and the evidence shows that with such knowledge and
prior to the bank's failure he voluntarily conveyed all his property
to members of his family.

3. BANKING—*when negligence of director in discharge of duties
not shown.* A director of a bank, who was also its president, can-
not be charged with loss of its funds by negligence in the discharge
of his duties, by evidence which shows that the cashier had mis-
used its funds over a long period of time as a result whereof the
bank was wrecked, that such director had heard a street rumor
tending to implicate the cashier in speculation, and had been
informed of other facts and circumstances not tending to arouse
suspicion as to the acts of the cashier or put the director on his
guard, and that while acting in the cashier's absence such director
was unable to find a certain savings account record, where it is
shown that the cashier had the confidence of the entire commu-
nity and was not suspected of misconduct by the persons who in-
formed the director of such facts and circumstances, that when
asked by the latter about speculating, the cashier denied it and
offered to resign, that the savings account records were so filed
that they could be found only by a person who was familiar with
the files, and that the misconduct had been concealed by the cash-
ier so skilfully that neither the finance nor auditing committees
or State bank examiners had found anything suspicious or crim-
inating in the accounts.

4. BANKING—*negligence by director in discharge of duties not shown by evidence of after-acquired knowledge of cashier's misconduct.* Evidence that the president of the bank was able to detect forgeries in the bank's securities after he had knowledge of the cashier's misconduct and that he then admitted knowledge of facts and circumstances tending to arouse suspicion of the cashier's actions is not sufficient to charge such president with the loss sustained by the bank through the cashier's misuse of the bank funds, as for negligence in the discharge of his duties as director.

5. BANKING—*failure of directors to discover defalcations by customary methods of bank examination not negligence.* Directors constituting the audit committee of the bank are not shown to have been negligent in the discharge of their duties, so as to charge them with losses sustained by their bank which was wrecked by the defalcations of a trusted employee who was not suspected of misconduct until after the insolvency of the bank, where they failed to discover the various criminal acts of the cashier in their periodical examination of the bank's affairs, where they were men of reasonable skill and intelligence and used the usual and customary methods in their examinations which were made with reasonable diligence and at regular intervals, where the books and records of the bank were so skilfully manipulated by the cashier as to make detection impossible except by the most minute scrutiny and examination by experts having knowledge of matters indicating manipulation of the books, and where it appears that they had no knowledge of suspicious facts or circumstances.

6. BANKING—*directors not chargeable for negligent discharge of duties in not using extraordinary methods of examining books.* Bank directors composing the auditing committee are not negligent in the discharge of their duties for their failure to reconcile the accounts of the bank with correspondent banks in their periodical examination of the bank's accounts nor in holding their examinations at stated rather than irregular intervals, where it appears that such reconcilement requires information not obtainable except after correspondence with the other banks, and that neither such reconcilement nor meetings at irregular intervals are according to the usual practice and custom in such examinations, and especially where it appears that such reconcilement would not have disclosed any material discrepancies.

7. BANKING—*when failure of directors on fianance committee to discover forgeries of bank securities not negligence.* Negligence in the discharge of their duties as bank directors, predicated on their failure to discover that a large amount of securities held

by the bank were forged by the cashier to cover his defalcations, is not chargeable against members of the finance committee where the evidence shows that they had no knowledge of any suspicious facts or circumstances, that they used the usual and customary methods in examining the bank's records and that they discharged all the duties of such committeemen in connection with loans with extraordinary diligence and ability, and that the forgeries did not appear to be in the cashier's handwriting, that the committeemen were not acquainted with the handwriting of the purported signers, and that the forgeries were so skilfully executed as to deceive, in some instances, the persons whose signatures were simulated.

8. BANKING—*absence from directors' meetings not negligence charging director where loss to bank not proximate result thereof.* A bank director, who was not a member of the audit and finance committees of the bank, which was wrecked by defalcations of the cashier by means of manipulated accounts and forgeries of the banks securities, is not liable for loss sustained thereby, as for negligence in the discharge of duties as director, by his failure to attend directors' meetings, where it appears that although he was an experienced and skilful banker and business man, the criminal acts could only have been discovered by an expert with knowledge of suspicion of wrongdoing by the cashier, that his absence was due, in large part, to sickness, and where it does not appear that the loss was proximately or otherwise due to his absence, and he had no knowledge of suspicious facts or circumstances, and that he examined the bank's accounts when present and exercised ordinary and reasonable diligence, care and skill.

9. BANKING—*when directors not liable for losses of bank through cashier's fraud in absence of notice thereof.* Directors of a bank, who were not members of any of the examining committees and had no actual or constructive knowledge of the cashier's defalcations, are not liable for losses sustained by the bank as for negligence in the discharge of their duties, predicated on general incompetence to act as directors and in appointing the auditing and finance committees, where the evidence shows that they were representative business men of the community who had been successful in their own affairs, reasonably literate in their native language and having some knowledge of English, and that they exercised reasonable and ordinary care and diligence in the discharge of their duties as directors.

10. WITNESSES—*interest of confessed criminal in result of litigation as affecting credibility.* In an action by the receiver of an insolvent bank against the directors to hold them liable for the losses sustained by the bank through defalcations by the cashier, a director cannot be charged with notice that the cashier was suspected of speculating, on the cashier's uncorroborated testimony

to that effect, where the evidence is contradicted by the director and it is admitted by the cashier that he expects immunity from prosecution for his confessed crimes.

PARTLOW, P. J., dissenting.

Error by the defendants to the Circuit Court of Will county; the Hon. FRANK L. HOOPER, Judge, presiding. Heard in this court at the October term, 1922. Reversed and remanded with directions. Opinion filed August 13, 1923.

COOKE, SULLIVAN & RICKS, DONOVAN & BRAY and RATHJE, WESEMANN, HINCKLEY & BARNARD, for plaintiffs in error; GEORGE A. COOKE, EDWARD H. FIEDLER, ADOLPH H. WESEMANN and FRANCIS L. DAILY, of counsel.

CHARLES S. DENEEN, W. D. HEISE and ROY MASSENA, for defendant in error.

MR. JUSTICE JONES delivered the opinion of the court.

This cause is brought before us to review a decree of the circuit court of Will county finding that the plaintiffs in error, who were bank directors of the Illinois State Bank of Crete, are liable for the losses of said bank amounting to more than $300,000, occasioned through the thefts, embezzlements and dishonest conduct of the cashier. The decree also found that the plaintiffs in error were guilty of negligence in the performance of their respective duties as charged in the bill of complaint and that such negligence was the proximate cause of the losses. The master in chancery was directed to determine the several amounts due from plaintiffs in error according to their respective liabilities as found by the chancellor.

, The bank involved in this case was situated in the village of Crete in Will county about thirty miles south of Chicago. This village has a population of less than 1,000. Not far distant from Crete are other

Ohlendorf v. Rathje, 230 Ill. App. 427.

villages whose population ranges from a few hundred to a few thousand. The City of Chicago Heights, with a population of about 20,000, is about four miles north of Crete. The bank was organized in 1908. The inhabitants of Crete were largely of German birth or descendants of German people. Many of them were retired farmers. The business of the village was similar to that ordinarily found in such a community. There had been a bank there some years previous. It had not been successful and was liquidated. The Illinois State Bank of Crete was organized by a number of citizens of Crete largely upon the initiative of Henry Schweer, a retail shoe merchant, who had theretofore been engaged in a small way in buying and selling real estate mortgages and in safe keeping funds for some of his friends and acquaintances. He interested Henry Kracke in the enterprise and these two men interested Louis Rathje, who a number of years prior thereto had resided in the vicinity of Crete. Later, Rathje moved to Chicago where he was quite successful, and was at the time in question president of the Chicago City Bank of Chicago. These men induced others to subscribe for stock, as a result of which the bank was organized with a capital stock of $25,000, represented by 250 shares of the par value of $100 each. At the first meeting of the stockholders, a surplus of $2,500 was provided by levying a ten per cent assessment against the stock. This surplus was apparently increased from time to time out of the undivided profits account until it amounted to $18,000.

There were twenty-three original stockholders. The by-laws of the bank provided for nine directors. The statute requires a director to be the owner of at least ten shares of unincumbered stock. There were only twelve stockholders owning ten or more shares, consequently, all but three of them were elected directors. There were few changes in the personnel of the board of directors from the date of its organiza-

tion. Two of them died while the bank was solvent. The remaining seven were directors at all times except that William H. Meier was not a director from January, 1912, to January, 1916, and Henry E. Meier was not a director in the year 1911.

Gus Kracke, then an employee in Rathje's Chicago bank and a son of the Crete bank's largest stockholder, was elected cashier. It is claimed that his selection was due to the influence of Louis Rathje. Whether or not this contention is correct is, in our opinion, of no moment, for the evidence indisputably shows that his habits were exemplary, his reputation for honesty and integrity was of the very best; he had sufficient education and experience to transact the business for which he was employed; his history and family connections were well known to the people of Crete; he was a devout member of the German Lutheran Church; he was at all times industrious and exceedingly frugal; his personal and family expenses were kept within his means and his home life was pure and simple. His selection appeared to be proper and well deserved. In addition to being cashier of the bank at the time of its failure, he was the village postmaster.

As would naturally be supposed, the business of the bank was not great. Its deposits seldom exceeded $150,000. It generally required the services of no one else than the cashier to attend to the business. Kracke possessed the absolute confidence of the directors and stockholders. When he was sick or absent from the bank on any cause, which was indeed seldom, the president of the bank, Henry E. Meier, performed the duties of the cashier. The good reputation of the cashier remained unblemished and untarnished until November 19, 1919, when the bank was closed by the Auditor of Public Accounts.

Just when the dishonest practices of Gus Kracke began is not entirely clear to us. The chancellor found that the bank was solvent December 17, 1914; and this

date was used by the chancellor in his determination of the liability of the several directors and we see no reason to change the date for such purpose. However, it is quite evident that the cashier was fraudulently manipulating the books and accounts of the bank considerably prior to that time.

Among the men in business in Crete was one William Seggebruch, a nephew of two of the directors. He was a saloon keeper and a real estate agent. He conducted a grain office where he bought and sold the grain of the farmers. He dealt in automobiles and built and owned a large garage. He was decidedly the active business man of the village. He did his banking business at the Crete bank. In 1911 his checking account was overdrawn. Often his overdraft was of considerable size, indeed so large that it frightened the cashier, who, in order to conceal the condition of the account from examination, began tampering with the books. By means of a system of bookkeeping employed by the cashier, William Seggebruch's overdraft was made to appear as a balance to his credit. At one time Gus Kracke went to his father and told him of the situation in reference to the overdraft and obtained from his father $20,000 which he applied on the shortage. Nevertheless he continued to permit Seggebruch to use the money of the bank and, at the time the bank closed, the overdraft of the Crete Garage, one of Seggebruch's enterprises, together with his other overdrafts, was approximately $100,000.

Seggebruch had been speculating in grain on the Chicago Board of Trade. In 1915, his accounts at the bank were so largely overdrawn that both he and the cashier knew that his overdrafts had imperiled the bank. The situation was desperate and they employed desperate means to meet it. The plan adopted to take care of the shortage was for Kracke to continue to furnish moneys of the bank for further grain speculations and thereafter he should have an interest in the

profits arising from the deals. In order to conceal his interest in the grain transactions, the business was carried on both at the bank and in the brokers' offices in Chicago in the name of "Seggebruch & Company." There was no broker's office in Crete. Seggebruch was the active man of the firm. He placed the orders and received the statements of account from the brokers. Remittances were made in the name of Seggebruch & Company. Kracke's identity was nowhere revealed. The results of their operations on the Board of Trade were disastrous and the losses were added to instead of diminished. The bank became insolvent.

The methods employed by Kracke to obtain money and to conceal the bank's true condition, as well as his own guilt, were numerous and varied. He obtained money by falsifying the certificate of deposit register,—for example, a customer made a time deposit of $2,500 for which Kracke issued to him an interest-bearing certificate for the correct amount. In entering the transaction upon the register, he recorded it as being for only $500. He was thus enabled to embezzle $2,000 by such manipulation. Transactions of this character were of more or less frequency. On other occasions he would extract the funds of the bank without making any bank record of the withdrawal. So completely was he trusted by the patrons of the bank that some of them left the keys to their safety deposit boxes with him. He withdrew their securities and disposed of them to raise money. Soon these methods were insufficient for his purposes. He then began to forge notes and place them among the notes belonging to the bank, so that the assets of the bank might not appear to be depleted. He forged other notes and sold them to the customers of the bank for cash. Upon the notes which he sold, he placed the bank's indorsement. Many of the forged notes were never in the note case and never registered. He ex-

plained to the purchaser of a forged note that the principal and interest were payable at the bank and that he would attend to the collection. They trusted him and he was thus enabled to conceal his forgeries. Miraculous as it may seem, they were never discovered until after the bank's failure, although some of the notes were against certain of the directors, others were held by members of his own family, including his father and his brother, and still others were against persons who were among the best customers of the bank. While the signatures on them were not in all cases skilfully made, none of them appeared to be in the handwriting of the cashier and all were sufficiently good to prevent detection by the parties to whom they were exhibited. In fact, in one or more instances the persons whose names were forged were unable on first examination to say definitely whether the signatures were genuine or not.

The numerous methods employed to conceal defalcations were as devious as were those to obtain money. It is apparent that in the case of the manipulation of the certificate of deposit register, as hereinabove mentioned, detection was well-nigh impossible. The depositor who held the certificate had no means of knowing that it had been entered on the register in a smaller amount, and an examiner of the register, not having the certificate, could not know that the certificate was for a larger amount than shown by the register. When the certificate was returned for renewal or payment, the cashier simply supplied the omitted figure to the register, thus making the entry correspond with the amount of the returned certificate. To hide his theft of assets, he used forged notes. He took real estate mortgages and collaterals from the safety deposit boxes of his customers and exhibited them as a part of the assets of the bank.

The by-laws provided for examinations by an auditing committee appointed by the directors. These ex-

aminations were made. Bank examiners from the State Auditor's office also made their usual and customary examinations. The cashier, until the fateful day in November, 1919, was able to deceive them all. When an examination was to be made he had everything ready for the occasion. He knew when the bank's affairs were to be examined by the auditing committee but it is not clear how he anticipated the coming of the State bank examiners. It may be that they proceeded from some nearby banks which they had examined and that he heard of their presence there. At any rate, he was prepared for their arrival. He deceived them not only through his false and fraudulent entries on the books of account, through the use of forged notes, through hypothecated securities of his customers, but also through the actual removal of the sheets showing the accounts of certain customers. The books were what are known as looseleaf ledgers. Just prior to an examination he would remove the Seggebruch accounts showing overdrafts. He would also remove the accounts of certain depositors who had considerable sums of money on deposit to their credit. Through manipulations of this kind he caused the books to balance and to be in such shape as to pass an examination not only of the auditing committee but of the State bank examiners as well.

Kracke had his system well in hand. He kept a sheet concealed in a drawer of a desk. This sheet gave him the key to his various defalcations, so that he could tell within a short time how much to withdraw from one source and how much to add to another, in order to cover up his guilt. This sheet appeared to be a dead or closed account of John Pralle. It therefore did not belong in the ledger containing the live accounts. No one discovering this account could be expected to conclude that it was anything else than a closed account of John Pralle.

On the afternoon of November 19, 1919, without pre-

vious warning or notice, two State bank examiners appeared at the bank. The cashier then had no opportunity to hide his crimes. He disappeared in the darkness. His speculations, thefts and embezzlements were revealed and the bank, having been ruined by him, was closed. He immediately went to a lawyer and transferred all his property, both real and personal, including certain certificates for whisky in which he was speculating and which had cost him about $9,000. All of such property was conveyed to his attorney in consideration of professional services to be rendered Kracke. He kept his whereabouts concealed for a considerable time.

In determining the question of liability of the directors in this case we must examine their conduct in reference to the discharge of their duties. "It is the duty of bank directors to exercise ordinary care and prudence in the administration of the affairs of a bank. They must be something more than figureheads. While they may generally commit the business to their duly authorized officers, this does not absolve them from the duty of reasonable supervision." (*Briggs v. Spaulding,* 141 U. S. 132; *Wallach v. Billings,* 277 Ill. 218; *Chicago Title & Trust Co. v. Munday,* 297 Ill. 555.)

The by-laws of the bank provided for the appointment of two committees, first, an auditing committee and second, a finance committee. At all times from and after 1915 the auditing committee was composed of William Saller and John G. Seggebruch. The finance committee was composed of the same two members and Henry E. Meier, president and *ex officio* a member of the finance committee. The duty of the auditing committee under the by-laws was to make an examination at any time, at its option, of all of the affairs of the bank, count the cash and compare the assets and liabilities with the balance in the general ledger for the purpose of ascertaining if the books

were correctly kept, and if the condition of the bank corresponds therewith and whether or not the bank is in a sound and solvent condition and report the result of said examination to the board of directors at its next meeting. The committee at its discretion was authorized to employ an expert to make the required examination and to certify the bill for his services to the cashier for payment. It was the duty of the finance committee to examine into and ascertain the sufficiency of the security offered for loans made by the bank, the value of commercial paper purchased by it and to advise the directors and officers concerning the same.

The auditing committee did its work on the last day of each year or the first day of the year following except that no examination was made the last part of the year 1918 or the first part of the year 1919, but was deferred at the suggestion of the cashier until June, 1919, when it was made. Examinations were conducted by the auditing committee in the following manner: The books showing the individual or checking accounts, the savings accounts, time certificates of deposit and drafts were taken to the back room of the bank. The cashier then presented to the committee a typewritten statement he had prepared showing all of the resources and liabilities of the bank. He also exhibited lists of figures prepared on an adding machine which purported to show the amounts of the real estate loans, the commercial loans, commercial deposits and savings deposits. He also produced a package containing real estate mortgages purporting to evidence the real estate loans of the bank. Saller had more education than John G. Seggebruch, the other member of the committee. Therefore, Saller opened the books and from them read the balances, and such balances were checked off on said lists by Seggebruch. It will be remembered that upon the occasions of these examinations the books, accounts, notes, mortgages

and securities had been manipulated by the cashier to deceive the examiners and thereby hide his defalcations. His efforts to deceive were successful and the results of the examinations were favorable reports by the auditing committee to the board of directors, with a subsequent approval of such reports by the board.

The finance committee met regularly each month and went over the loans from a list prepared by the cashier. The method employed by the committee was for one of the members to take the notes and call off the amounts thereof and such amounts were then checked upon the list furnished the committee by the cashier. The discount or note register was not examined or compared with the notes themselves until the last three months of the existence of the bank, when at the suggestion of one of the directors, Louis Rathje, this method also was employed. The result of these examinations showed no discrepancies for the reason that the cashier had seen to it that the discount register and the notes on hand corresponded with each other and of course with the typewritten slip he furnished the committee. The evidence shows that only about $100 was lost by the bank in bad loans throughout its existence.

For the purpose of discussing the evidence as it applies to the various directors we have grouped them into five classes, to wit:

First: Gus Kracke and Henry Kracke.

Second: Henry E. Meier.

Third: William Saller and John G. Seggebruch.

Fourth: Louis Rathje.

Fifth: Fred Seggebruch, Fred Helmke and William H. Meier.

It requires only a short recital of the facts to determine the liability of the directors included in the first class. Gus Kracke is not only a proven but a self-confessed thief and embezzler. He wilfully and feloniously betrayed every trust his associates and the public reposed in him. He was untrue to his God, his

church and his fellowman. As a banker he robbed his customers and wrecked the bank. As postmaster he was a defaulter and absconded with the public funds. As a church member he shamed religion. In his family relations he deliberately stole from his father and brother. As a fugitive from justice he deserted his wife and, as a climax to this tragedy, death took both his wife and his father to release them from grief.

In due time he was indicted by the grand jury of Will county. He returned to the scene of his crimes and was given full access to the bank books which he had despoiled. He has actively assisted the complainant in the preparation of his case and has furnished a great part of the testimony upon which the decree rests. He has successfully resisted every attempt made by the State's Attorney of Will county to place him on trial or to even have him arraigned. He has never been called upon to plead. He admitted on the hearing of this case that he does not expect to be sent to the penitentiary or to be prosecuted under the indictments against him.

Henry Kracke, the father, knew a long time before the bank failed that his son was mismanaging its affairs. Gus had come to him and had made at least a partial confession. The father gave his son $20,000 as an advancement to cover up the William Seggebruch shortage. Henry Kracke was a director of the bank but he never revealed to a director or a stockholder the things which had come to his knowledge through the admissions of his son. Being conversant with the situation, he voluntarily conveyed all of his property to his children prior to the failure of the bank, and the charge is made that he did so in an effort to put his estate beyond the reach of the creditors of the bank. By his answer to the bill of complaint he admitted not only the criminality of his son but his own knowledge of his son's misdeeds, his negligence as a director and his liability as a defendant. Gus

Ohlendorf v. Rathje, 230 Ill. App. 427.

Kracke adopted the answer of his father to the bill of complaint. Therefore the liability of the members of the first class, to wit, Gus Kracke and Henry Kracke, is admitted.

In the second class of directors is Henry E. Meier, the president of the bank and a member of the finance committee. He was possessed of sufficient qualifications for the positions he held. It is not claimed that he or any other director, except those included in the first class, had actual knowledge of the dishonest conduct of the cashier, but it is insisted that he was possessed of sufficient information concerning suspicious facts and circumstances so that, as a reasonably prudent and careful person, he should have become aware of the cashier's misuse of the funds of the bank. These circumstances are as follows: Fred Saller, a stockholder and a brother of William Saller, on one occasion went to Chicago and met Gus Kracke and William Seggebruch in the office of Bennett & Company, brokers. Later, upon his return home, he told Meier and also his brother that he had met William Seggebruch in a broker's office on the Board of Trade and cautioned Meier against loaning Seggebruch too much money. Saller gave the caution, as he says, because he thought Seggebruch was handling too many automobiles. The witness testified that he never told either Meier or his brother of his having met Kracke there; that it had not occurred to him that Kracke was engaged in speculation but he had assumed that Kracke was in the broker's office in connection with some business of the bank. The witness himself had no suspicion of misconduct, and the visit of Kracke to the broker's office was not even known to the president of the bank or to the director Saller.

Another alleged suspicious circumstance against Meier is that in a conversation with one Henry Schaeftlein, after the bank had failed, the latter asked Meier how it happened he did not follow up the

Seggebruch checks to the books and see what was being done with them and that Meier replied that he had gone to Seggebruch and asked him how he stood with the bank. The conversation was ended at this point and nothing further was said upon the subject. We wholly fail to see how this fragmentary conversation has any probative force. Now that the misconduct of Kracke is fully known and his methods completely exposed, anyone with average intelligence can conceive plans by which such misconduct could have been discovered. But the test of prudence and good faith on the part of a director of a bank is not what was within the range of possibilities for him to do, but what should he have done, reasonably, under the circumstances surrounding him at the time he was called upon to act. (*Dresser v. Bates,* 250 Fed. 525; *Bates v. Dresser,* 251 U. S. 524; *Briggs v. Spaulding,* 141 U. S. 132.) The same observation can be made in reference to the criticism of Meier's conduct in failing to detect the existence of forged notes in the bank. It is claimed that he was able to pick out some of the forgeries after the bank had closed, but it must not be forgotten that when he was called upon to do this he was disillusioned as to the integrity of the cashier and instead of having faith in his honesty, he now knew him to be a thief and a forger. Meier was able to suspect some of the notes were forgeries because he was looking for forgeries and because he believed that some of the purported makers of notes "could not be borrowers." John D. Scheiwe, cashier of the First National Bank of Steger, a village near Crete, testified that after the failure of the bank he had a conversation with Meier, who said Saller had at one time told him that he thought Kracke was speculating on the Board of Trade; that Meier, a few days thereafter, went over to Kracke and asked him if he was in fact so speculating; that Kracke replied there was not anything in it; that it was a mistake and, "If you gentle-

men think I am speculating on the Board of Trade why I will hand you over my keys and I will step out of the bank right away." The witness further testified that Meier said the information he had received from Saller was a surprise to him and that after he had had a talk with Kracke he was thrown off his guard and was convinced Kracke was not speculating.

Fred Pehrkon testified that in a conversation he had with Meier subsequent to the failure, Meier told him that he had heard a rumor to the effect that Kracke was "gambling" and that Meier had asked Kracke if the report was true and Kracke denied it. Meier denied making these statements to Scheiwe and Pehrkon and he also denied that Saller had ever told him he believed Kracke was speculating on the Board of Trade or was gambling. He is corroborated by Saller, who testified that he never told Meier he suspected Kracke of speculating on the Board of Trade or of gambling. Just what foundation there was for the testimony of Scheiwe and of Pehrkon is not apparent. Their testimony relates only to alleged admissions made by Meier at a time subsequent to the bank's failure.

It is hard to harmonize it with the fact definitely established by all of the witnesses in the case that at no time during the life of the bank did anyone ever entertain an opinion, much less express one, that the cashier was gambling in grain or anything else. The whole record conclusively shows that the entire population of Crete and vicinity had at all times the utmost confidence in the cashier and no one believed that he would be guilty of such conduct. The only direct testimony tending to show that Meier had any intimation that the cashier was gambling is to be found in the testimony of the cashier himself, who stated that about two years before the bank closed Meier came into the bank and said that he had heard that he, Kracke, was speculating and asked whether or not it

was true. Meier denies that he had any such conversation with Kracke and there is therefore a question of veracity raised between them.

Still another incident is that connected with the Walter Withers savings account. One day, during the absence of Kracke, Henry E. Meier was staying in the bank. Mrs. Withers brought her pass book to the bank and asked that a credit of interest be given. Meier went to the ledger and after looking at it a short time stated that he could not find the account. Mrs. Withers then remarked that she would wait until Kracke returned. A day or so later Meier was in the bank and told Kracke that Mrs. Withers had been in and that he had not been able to find her husband's savings account. Thereupon Kracke went to the ledger, found the account and showed it to Meier. The matter was never thereafter mentioned either by Mrs. Withers or anyone else. The savings accounts were not arranged in the ledger in alphabetical order nor in consecutive numerical order. Each savings account bore a number beginning with number "1." Whenever an account was closed the record sheet was taken out of the ledger and no new account was given that number. As a result the accounts were not consecutively numbered. It is not even testified to by Kracke that this account was not actually in the ledger on the day Meier looked for it. He was not asked about the matter and his testimony in reference to the removal of accounts would indicate that accounts were not kept out of the ledger except at such times as an examination was to be made. At all other times the accounts were kept in the ledger.

We have discussed practically all of the evidence offered for the purpose of showing that Meier had enough information of Kracke's speculations to arouse in the mind of an ordinarily prudent person a suspicion of wrongdoing sufficient to put him on guard. Inasmuch as Meier was a member of the fi-

nance committee we will discuss the evidence in regard to his conduct as such committeeman when we deal with the other members of that committee who are included in class three.

The members of the third class are William Saller and John G. Seggebruch. They were the only members of the auditing committee and were the only members, except Henry E. Meier, of the finance committee. We have already stated somewhat in detail the method of making the regular audits or examinations. The slips prepared by the cashier for the use of the committee in its examination of the affairs of the bank were purely for the convenience of the committee. They were in so sense intended as a guide to their conduct. They were used to aid in the examination of the books and to render it unnecessary for the committee to write down the items as they were called off from the books. They were used also for the purpose of showing accurate additions. Saller handled the books. He called off the totals on every page in the register of commercial deposits, of savings accounts and of each certificate of deposit. These were checked by Seggebruch, the other member of the committee. The notes, the real estate loans, the cash and other items pertaining to the business of the bank were examined and checked in the same way. The result of the examinations thus made was then compared with the general ledger which was a loose-leaf book containing the accounts of the bank grouped under general heads and was kept for the purpose of showing the resources and liabilities of the bank. Of course, Kracke, the cashier, had so manipulated the figures in this ledger as to make them correspond with the results obtained by the committee in its examination and also to correspond with the summary shown in the statement book, which purported to disclose the daily condition of the bank. He saw to it that on examination days these books apparently tallied. Undoubted-

ly these men made at least as thorough examinations into the affairs and condition of the bank as is general and customary among such officers. They undoubtedly employed considerable diligence and a reasonable and ordinary amount of skill. While it is true that examinations such as they made did not bring to light the defalcations of the cashier, still this is not the test as to whether or not the committeemen used reasonable care and prudence in the performance of the duties imposed on them, as members of the auditing committee. They were not bound to prevent or discover thefts. Although directors cannot implicitly rely upon the examinations made by State bank examiners and thereby excuse themselves for a failure to make the examinations required to be made by them, nevertheless, an examination and favorable report by the State bank examiners may be taken into consideration by such committeemen in determining that their own examination has been reasonably correct. As an illustration of the completeness of the deceptive methods used by the cashier in keeping his accounts, the State bank examiner in his report of the condition of the bank on September 16, 1915, stated that, "The records of the bank are very well kept and the bank seems to be doing nicely." Directors are not presumed to be expert bank examiners but even if they were experts they may not have discovered the true condition of the bank. State bank examiners made annual examinations of this bank from 1908 until 1915. They made no examination in 1916, but did make examinations in 1917, 1918 and 1919, the last examination being made only a few months before the bank closed. None of these examinations ever disclosed or revealed the discrepancies which really existed. The methods and plans employed by the cashier in the keeping of his books and accounts were sufficient to deceive them. Even on the 19th of November, 1919, when the two State bank examiners unexpectedly came to the bank

and began their examinations they at first concluded that the cash balanced.

A circumstance relied upon by the complainant to show that this committee had notice of facts which should have led to an investigation of the relations between the cashier and William Seggebruch is found in the testimony of William Orr. Seggebruch and Orr at one time had been friends but some ill feeling had arisen between them because of a transaction which they had had together on the Chicago Board of Trade. After that time they were not good friends. Orr testified that on certain occasions he had seen the cashier leave his home before banking hours and go to the postoffice. Later he saw Kracke go to Seggebruch's grain office and then to Seggebruch's garage where he stopped and talked to some one for a few minutes before going to the bank. He also testified that he had seen William Seggebruch on two occasions come out of the bank with a handful of money; that this made him suspicious and he wondered whether the money belonged to the bank or to Seggebruch; that he did not think much of it at first because Seggebruch was building a garage. He told what he had seen to William Saller. On cross-examination he testified that at no time did he ever have a suspicion that Kracke was speculating and that he never did hear a man of the town of Crete say, before the bank failed, that he suspected Kracke of speculating. We can see nothing in this incident that is calculated to arouse the suspicion of anyone against the cashier and we do not believe that it was the intention of the witness to convey an impression that there was anything about the circumstance which reflected on Kracke. Orr was prompted by a feeling of bitterness against Seggebruch and wanted to limit him in his business operations by injuring his credit with the bank. One would indeed be overly suspicious if he can see something

wrong in a man's coming into or going out of a bank with money in his hand.

Another alleged suspicious circumstance is that the cashier kept a calendar pad near the telephone on which he wrote quotations of grain prices and that said calendar pad was left where it could be observed by the directors. It is now a general plan among country banks to receive and post daily market reports for the benefit of their customers.

Complaint is also made that the auditing committee did not reconcile the accounts of the bank with their correspondent banks, that is to say, they failed to ascertain whether the amount in the correspondent banks agreed with what the books of the Crete bank showed was to its credit. In order to make this reconcilement it is necessary to know whether credits which have been sent to the correspondent banks have been received and whether all the drafts issued by the local bank against the correspondent banks have been paid. The process of making a reconcilement therefore requires time, for example, if an examination were held upon the first day of a month, the reconcilement in order to show the true situation at the beginning or close of business on that day could not be ascertained until reports from the correspondent banks could be received. The evidence of the bank examiners tends to show that it was neither usual nor customary for directors of banks of this kind to reconcile their accounts with their correspondent banks at the time of an examination. However, whether this be true or not, the testimony further shows that a recent examination of the books both of the Crete bank and its correspondent banks disclosed that there was no material discrepancy in the account on any occasion when the auditing committee made its examination nor on any occasion when the State bank examiners made their examinations.

It is further claimed that the examinations of the

auditing committee should have been made at irregular intervals but the testimony of the bank examiners is to the effect that it is not the practice or custom in Illinois for such committees to conduct examinations at irregular intervals.

We think it is altogether unnecessary to deal at any length with the complaints against the finance committee as such. It is a remarkable fact that the bank never lost on any loan it ever made, except one, and it only lost a part of it. It loaned a man $200 and was able to collect only one-half of it. The committee inspected all loans. It discussed the solvency of the makers of the notes. One of the members even went upon the lands which were included in certain of their real estate mortgages. The only complaint against this committee which has any substantiality is that the members should have known that some of the notes which were among the assets of the bank were forged notes. But even this complaint cannot be seriously considered when it is remembered that none of the signatures on the forged notes appeared to be in the handwriting of the cashier; that the members of the committee were not acquainted with the handwriting of those purporting to have signed the notes and that in at least one or more instances the signatures were so much like genuine signatures as to fool the persons whose names had been forged.

The defendants have been held liable for a large number of forged notes which were never placed in the note case and were never known by any of the directors to exist. They were forged by the cashier and sold to outside parties. The total amount of forged notes at the time of the bank's failure was $136,470.74. They were also held liable for $8,000 of Liberty Bonds which had been hypothecated by the cashier, $2,000 of which belonged to the bank and $6,000 to customers. The theory upon which the directors are held liable for the bonds owned by customers is that the directors

should have known the cashier was a thief and was likely to steal the customers' bonds.

The next class to be considered is composed of Louis Rathje. He was not a member of any committee. He was an experienced banker and a successful business man. His home was in Chicago and he has not been in good health for a number of years. On account of his ill health he has spent several winters in Florida. He attended no directors' meetings in the years 1915 and 1916. In 1917 the Auditor of Public Accounts addressed a letter to the bank in which he called its attention to the fact that Rathje had failed to attend any meetings of the directors for more than twelve months and requested that a suggestion be made to him that his resignation would be acceptable. This letter was not called to Rathje's attention until the following year. However, he did attend meetings in June, 1917, in August, October and November of 1918 and three meetings in 1919. It is conceded that he suffered a severe illness in 1918 and was compelled to make two or three trips for his health afterwards. The testimony shows that when he received through the mail the printed statements of the condition of the bank, he examined them, checked them up and preserved them in his files. In 1917, the statement showed a decrease in the bank's deposits. At a directors' meeting in 1917, he called the cashier's attention to that fact and urged him to get around among the people and use his efforts to increase the deposits. He never made a personal examination of the books of the bank. In 1919 he failed to take the oath provided by statute. During the period when he was in Chicago he generally attended the meetings of the directors of the Chicago State Bank of which he was president. He also attended directors' meetings of another institution in which he was interested and which was located not a great distance from his Chicago home.

The directors in the last class are Fred Seggebruch, Fred Helmke and William H. Meier. It is charged against them that in the exercise of ordinary care they should have ascertained that the auditing and finance committees did not reasonably and prudently perform their duties; that they were negligent in permitting themselves to become directors because they knew they were incompetent to perform the duties of their office. There is a general charge against them as well as against all other directors that they negligently appointed, as members of the finance and auditing committees, certain persons who were not reasonably competent to perform the duties devolved upon them.

Fred Helmke was born in Germany. He was well acquainted with the people of Crete. He has a family consisting of a wife and five children and is a retired farmer. He was a successful business man and was well acquainted in his community. He was a regular attendant at directors' meetings.

William H. Meier was born in this country on the farm where he is now living. He attended a parochial school until he was nearly fourteen years of age. He also regularly attended directors' meetings. He was regarded by all who knew him as a sound and reliable business man.

Fred Seggebruch was a farmer and operated 390 acres of land, all unincumbered. He freely spoke the German language and could read and write in English, but not well. He was fifty-six years old and married. He attended directors' meetings regularly but knew very little about bookkeeping. As an evidence of his faith and confidence in the cashier, it may be stated that on the day the bank failed he bought $3,800 worth of securities from the cashier, which turned out to be bogus.

Apropos to this fact and for the purpose of rebutting the imputation that the directors were possessed of information which was calculated to apprise them

of Kracke's speculations, it was shown that when the bank closed its doors John G. Seggebruch had $4,000 on deposit and held a forged note for $2,000 which Gus Kracke had sold him. Fred Seggebruch, in addition to holding bogus notes, was also one of the confiding members of the community who intrusted to Kracke the key to his safety deposit box containing securities of the value of $9,000. He and his family had $700 on deposit. Fred Helmke and family had $1,250 on deposit and William H. Meier had nearly $2,000 on deposit.

We have endeavored to state the salient facts in the case as they appear from the evidence. It is impossible to state all of them without unduly extending this opinion. The ones we have stated are typical of the others. We will now endeavor to apply the law as it affects the various directors, under the facts.

Each case involving a question of liability of bank directors, for losses, claimed to have been incurred through their negligence must be decided in view of the circumstances of the particular case. Nevertheless, questions much like those here involved have been frequently before the courts. Many of the rules of law governing them are well settled. The duties of bank directors "may in general be stated to be the exercise of such care, skill and diligence in the transaction of the business of the bank as prudent men exercise in the conduct of their own affairs. That duty is one of ordinary diligence and care in the supervision and control of the affairs of the bank and in knowing the condition of its business." (*Becker v. Billings,* 304 Ill. 190.) "They must exercise reasonable supervision over the conduct, affairs and condition of the bank." (*Chicago Title & Trust Co. v. Munday,* 297 Ill. 555.) "Any suspicious fact concerning an employee of a bank coming to the knowledge of a director calls for immediate and thorough investigation by him." (*Martin v. Webb,* 110 U. S. 7.) "While it is

the duty of directors to supervise the affairs of a bank they are not required to be bookkeepers or skilled accountants." (*Mason v. Moore*, 73 Ohio St. 275; *Dresser v. Bates*, 250 Fed. 525.) "Directors are not insurers of the safety of the funds of a bank nor of the fidelity and honesty of the cashier. They are not required to adopt any system of espionage over him or to entertain a suspicion until some circumstance transpires to awaken a just apprehension of his want of integrity." (*Warner v. Penoyer*, 91 Fed. 587.)

The first question we will discuss is whether or not the directors and particularly those who were committee members should have become aware of the true condition of the bank through an examination or inspection of the books and records of the bank. It is undoubtedly the law that the duty of making an investigation of the affairs of a bank may be imposed upon a committee. This is necessarily so. Many banks now have very large directorates. It would be impossible for each of the directors to conduct an examination and check all the books and accounts of the institution. In the very nature of things many directors, in fact the average bank director, is not capable of making an accurate and detailed examination and yet he may be a very valuable man on the board of directors. His judgment as to loans, discounts, investments and financial matters, generally, may be of the highest order and of the greatest value to the bank, and still he may be wholly unequipped to perform the duties of a bank examiner. The law recognizes that banks are public necessities; that to meet this necessity it is convenient to have in every community center of considerable population and business, one or more banks. Necessity again demands that at least a majority of the directors of a bank be residents of the community in which the bank is located. This necessity arises from the importance of accurate and definite information and acquaintanceship with the

people, their habits and character as well as the value of the property owned by them. The Illinois State Bank of Crete was organized and its board of directors was constituted just as it would be natural to expect. The bank was not over capitalized. Nearly all of its stockholders resided in the immediate vicinity. The board of directors was taken from the leading citizens of the community and comprised all but three of the stockholders who had sufficient stock to make them eligible for the position. The record shows that they all bore excellent reputations for honesty, industry and frugality, that they not only were considered but indeed were careful, prudent, successful business men. Some of them were not possessed of much education. Some of them did not even speak and write the English language well, but they did know and understand the language, the customs and the habits of the people who lived and did business in that German community.

The cashier was not one of the original directors of the bank. He was elected to fill a vacancy which had occurred upon the board. It is not contended that at the time of his election there was any apparent reason why he should not have been chosen. His election appeared to be a most appropriate thing. The directors adopted by-laws similar to those adopted by other banking institutions. They provided for the selection of an examining committee. Upon this committee was imposed the duty of examining the books and affairs of the bank. For the purpose of causing the examination to be made in a manner conformable with what the directors considered the best method, the by-laws prescribed how the work should be done. Those on the committee seemed to have faithfully and diligently attempted to make the examination as provided by the by-laws as well as to perform all of the legal duties devolved upon them as directors and committeemen. They counted the cash, they compared the assets and

liabilities with the balances in the general ledger. They checked the notes. They examined the real estate loans as well as the securities. They compared the totals in the statement book with the totals in the general ledger. All this was done to ascertain whether the bank was in a sound and solvent condition. They concluded that it was in such condition. Later it was discovered that this conclusion was wrong; that the books and records which they had used in making their examinations had been fraudulently altered by the cashier; that through a system both secret and cunning he had caused the books to speak a lie. He had withdrawn pages from the ledgers. He had changed figures on the books. He had omitted figures from them. He had placed securities which belonged to others with those of the bank in order to increase the totals. He had forged notes and placed them with the genuine notes of the bank. His system of falsifying the records displays unusual skill and cunning. In none of the reported cases cited by counsel on either side is there to be found a story of such subtle, crafty and deceitful criminality. His artful deception not only deceived the plain, honest, credulous business men of the board of directors but effectually deceived the State bank examiners who were employed for the purpose of searching out the affairs of the bank and who are presumed to be experts in the examination of bank accounts, as well as in the detection of fraud and the discovery of defalcations.

Of course these discrepancies existed and we assume that there was always a possible way by which the wrongdoings of the cashier could have been detected. We have no doubt that there is never a case of dishonesty in the conduct of a bank cashier which is absolutely impossible of discovery. The great difficulty, where the design is artful and the theft or embezzlement is hidden, is to find a real clue. When the offense is once made known the methods employed by

the thief are generally not hard to unravel. Counsel for defendant in error point out a number of ways by which detection might have been made through an examination of bank records. There is no doubt that some of them would have been effective. Others probably would not have been effective. In any event the means suggested would have been unusual and extraordinary and would have been adopted only because of knowledge or suspicion of the cashier's dishonesty. The record in this case clearly shows that the directors had no such knowledge or suspicion. In fact the community of Crete seems to have been thoroughly searched for a witness who would testify to some fact or circumstance which would show that some one or more of the directors had actual or presumptive knowledge that the cashier was dealing in options. No one was found who would say that there was even a breath of suspicion that Kracke was dishonest or short in his accounts.

All that the law required of the directors including the auditing committee was that they act in good faith and with ordinary diligence in exercising their duty of general control and supervision. They were not called upon to devote themselves to the minute details of the business. They were not required to adopt any system of espionage over their cashier without some reason which was apparent or until some circumstance transpired to awaken a just apprehension of his want of integrity. They had a right to assume that he was honest and faithful. (*Warner v. Penoyer, supra.*)

What is now known of the bank's condition is the result of examinations conducted by experts. We can view such situation in the light of the disclosures made. The directors had no such light.

Since the bank closed its doors State bank examiners have devoted much time and effort to reveal the methods employed by the defaulting cashier. The

cashier himself has been given access to the records and has spent months of time in disclosing his nefarious system. As was stated in the case of *Swentzel v. Penn Bank*, 147 Pa. St. 140: "Under such circumstances it would be an act of gross injustice to hold directors liable for the frauds of others in which they had not participated   *   *   *   and which have only been brought to light by the aid of experts. The transaction must be measured by the light which the directors had at the time the transaction occurred. It would be unfair to judge them by the calcium light which has been turned on later."

It therefore appears that if it be true, as contended by plaintiffs in error, that they had no actual or constructive knowledge of the cashier's frauds, they cannot be held liable for the bank's losses, because of their failure to make examinations of the records other and different than were made. Surely this must be true as to the directors who were not on the auditing committee.

The authorities agree that the duty of making examinations may be placed upon a committee appointed for that purpose and those not on the committee cannot be held liable simply because the committee is negligent. (*Bates v. Dresser, supra; Wallach v. Billings, supra.*)

The charge made against the members of the finance committee is that they did not discover the existence of the forged notes which were a part of the supposed assets of the bank. This, it is claimed, could have been done in two ways, first, by closer inspection of the signatures on the notes, and second, by a checking and examination of the note register. We have already expressed our view that the character of the forgeries was such that they were not only calculated to deceive the finance committee but actually did deceive the members of it. With reference to the contention that a checking of the note register would have revealed

the forgeries, it may be said that it is admitted that such note register was checked by the finance committee in each of the last three months of the bank's existence and no discrepancy was discovered by such examination.

As to Louis Rathje, it is urged that he is liable because he neglected to attend directors' meetings regularly; that, being an experienced banker, it was his duty to make a personal examination of the records, and that he had received information of the gambling activities of the cashier. Beyond all question it is the duty of a director to attend board meetings as regularly as it is reasonably possible to do so. If he is negligent about this duty and the bank suffers loss on account of it, he ought to be held liable for the losses. During a large portion of the time losses were being sustained, Rathje was a sick man. He was traveling on account of his health. He was probably not in condition to attend directors' meetings in any corporation which did not have its principal office very near to his home. But this would not excuse him if the losses were caused by his protracted absence. If a director's physical condition is such as is likely to prevent attention to duty for a considerable length of time, he should resign and make way for another who is able to discharge the duties of the office. But has it been shown that his absence from directors' meetings was the proximate cause of the losses? We think not. He was on neither the auditing committee nor the finance committee. These committees seem to have performed their duties with reasonable diligence and skill and it does not appear that if Rathje had attended every directors' meeting, such attendance would or might have been a means of the discovery or prevention of the losses.

In *Wallach v. Billings*, 227 Ill. 218, a bill was filed against Billings and others, charging him with negligence as a director and seeking to hold him liable for

Ohlendorf v. Rathje, 230 Ill. App. 427.

the losses of the Chicago National Bank which had failed because of the unlawful and illegitimate transactions of its president, John R. Walsh. Billings was a man of great business and financial skill and acumen. He was a director during the years 1901 to 1905 both inclusive. During the last two and one-half years he failed to attend any meetings of the directors. He was held not to be liable because there was no causal connection between the losses and his failure to attend directors' meetings. And the Supreme Court of this State said: "It is the theory of appellants, in brief, that all that it is necessary to show in their bill of complaint is the inattention of Billings as a director and that the bank sustained losses. There is no doubt but that directors of a national bank are liable in some cases for losses to the bank of which they are directors, but it is equally true that they are not liable for every loss which happens to occur. Such a rule would make a bank director an insurer, which he is not." It was also said on page 232 that: "It does not follow because a director has failed to attend meetings that he is legally or morally responsible for the disasters that may have befallen the bank.   *   *   * The board had provided for a reasonably vigilant supervision of the cashier.   *   *   *   Those directors who attended the meetings and had no reason to suppose that the members of the discount and examining committees were neglecting their duties are not responsible for the losses, which are solely attributable to such neglect. The directors who did not attend the meetings are in no worse category. What could they have done or prevented, exercising common diligence, if they had been present? A director who has failed to act is not liable for the thefts or shortcomings of the cashier, unless it appears, inferentially at least, that the omission had some proximate relation to the losses."

In the case of *Bates v. Dresser*, *supra,* the defunct bank was a small institution having deposits amounting to about $300,000. Coleman, the teller, had been brought up in the bank from a messenger. He became dishonest and began a series of thefts from the bank which totaled at the time of the discovery to more than $300,000. For several years he concealed his guilt by "kiting" checks, by falsifying the records and by other means somewhat similar but not so crafty as those employed by Kracke. His methods deceived the National bank examiners as well as the examining committee of the bank. Like the Crete bank, the by-laws provided for a committee to "examine into the affairs of the bank, to count the cash and compare its assets and liabilities with the balances in the general ledger, for the purpose of ascertaining whether or not the books are correctly kept and the condition of the bank in a sound and solvent condition."

Coleman had falsified his ledger showing the savings accounts. The ledger did not agree with the pass books. Had the pass books been called in and compared with the ledger, the discrepancy would have been discovered. The directors did not call them in and they were charged with negligence for not doing so. All of the directors except the president were held not to be liable for the losses. The court said: "We are not prepared to reverse the finding of the master and the circuit court of appeals, that the directors should not be held answerable for taking the cashier's statement of liabilities to be as correct as the statement of assets always was. * * * Their confidence seemed warranted by the semiannual examinations by the government examiner * * *. They were not bound by virtue of the office gratuitously assumed by them to call in the pass books and compare them with the ledger, and, until the event showed the possibility, they hardly could have seen that their failure to look

at the ledger opened a way to fraud.'' The president was held liable only upon the ground that he had actual notice of the teller's criminal conduct.

Defendant in error puts much stress upon the case of *Bowerman v. Hamner,* 250 U. S. 504. We do not believe this case should have any controlling influence here. Bowerman was a director during the entire five and one-half years of the existence of the bank but never attended a single directors' meeting. The bank failed because of certain excessive loans which were beyond the amounts permitted by law. He had been aware of the existence of these loans for a number of years as was evidenced by a letter written by him to the president of the bank in which he warned the latter of the consequences if the ''very hazardous manner of conducting the bank'' was not changed. The Supreme Court of the United States in its opinion said: ''Bowerman was a banker, and the letter from which we have quoted, written to the president of the bank, which failed, shows he so understood the business of banking and what was necessary for the safe conduct of it that even slight care on his part in the discharge of his duty as a director must have discovered and arrested what he himself characterized as a hazardous manner of conducting its affairs.''

In reviewing the reported cases involving the liability of bank directors for losses, it will be observed that there is a marked distinction between cases growing out of losses occasioned by loans improvidently made or loans in excess of the legal limit or by hazardous investments, and the cases growing out of losses resulting from concealed thefts, embezzlements, etc. In the first class, the losses were occasioned by obvious things, matters which from their very nature are bound to be known to the directors. In this class of cases the directors are always held liable. But where the thefts have been so covert that a reasonable examination of the books, such as is expected to be cus-

tomarily made by bank directors, will not reveal the crime, the directors have never been held liable.

There is absolutely no evidence here tending to show that Rathje had any actual knowledge of the fact that the books were being improperly kept or that the cashier was guilty of any of the crimes now known to have been committed by him. Rathje attended various meetings of the bank during the time when most of the losses were sustained. He examined the statements. He noted the increase of deposits. He commented upon them. He caused a change in the method of checking the notes with the discount register. He suggested ways of increasing the deposits and it cannot be properly charged against him that he omitted to perform, at any meeting which he attended, any duty which was incumbent upon him. Notwithstanding this fact, the dishonesty of the cashier and the consequent losses of the bank were not discovered and we fail to comprehend how such dishonesty would have been discovered even though Rathje had attended every meeting of the directors. Clearly his failure to attend was not the proximate cause of the losses. Neither is there any causal connection between his absence and such losses. Did the mere fact that Rathje was familiar with bank books and was competent as an accountant render it necessary for him, under the circumstances as they existed at that time, to have made a personal examination of the books of the bank? We think not. That duty was cast upon others. He was not required to do it for them. All the law required him to do was to use reasonable diligence to see that the committee, whose business it was to make the examination, did it with reasonable diligence, care and skill. In view of the fact that we hold that the committee did its work with such diligence, care and skill, we must conclude that Rathje was not negligent in his duty so far as it related to the supervision of the work of the auditing committee.

It is urged that Rathje had knowledge of the cashier's grain speculations. This is based altogether upon the testimony of the cashier that just before the directors' meeting in June, 1917, Rathje took him to one side and asked him whether or not he was engaged in speculations. Kracke claims that he answered, he was not. Kracke asserts that no one except himself and Rathje heard this conversation. Rathje insists that it never took place and that at no time prior to the bank's failure had he ever heard or suspected Kracke was gambling. To say the least, Kracke's story is somewhat unreasonable. If, as he says, the deposits were then falling off and Rathje suspected him of gambling on the Board of Trade, it is altogether unlikely that the incident would have received no further comment from Rathje, the hard-headed, shrewd, capable business man. If Rathje had been suspicious of Kracke and had thought that his speculations were affecting the condition of the bank, it is next to certain, if not absolutely certain, that he would have taken some action to rid the bank of its cashier. His failure to take such action is strongly indicative of his unwavering confidence in a man to whom he had given business training, and equally indicative of a total lack of suspicion of wrongdoing. But if there were no such indicative circumstances this court ought not to be expected to accept the unsupported and uncorroborated testimony of Gus Kracke, especially when his testimony is flatly contradicted by men of good reputation for veracity.

Even though the testimony of Gus Kracke may have been somewhat induced through remorse of conscience, it is nevertheless admitted by him that he expects to secure immunity from prosecution under the indictments now pending against him in the circuit court of Will county. Interest of this kind has at all times been held to affect the credibility of a witness. The testimony of an informer is always subject to a

suspicion whether he gives his testimony in a civil action or in a criminal prosecution. Every reason given in a criminal case for the support of this doctrine can be applied with equal force to this case. In *Hoyt v. People,* 140 Ill. 588, in discussing the testimony of such a witness, the court said: "It has often been questioned in England and in this country, by courts of the highest respectability, whether convictions on such testimony alone should be allowed to stand; but it is held by this court, in conformity with the prevailing ruling elsewhere, that convictions may be sustained on such testimony, alone, although the court may, in its discretion in such cases, advise the jury not to convict. * * * But the authorities agree and common sense teaches that such evidence is liable to grave suspicion and should be acted upon with the utmost caution, for otherwise the life or liberty of the best citizen might be taken away on the accusation of the real criminal, made either to shield himself from punishment or to gratify his malice. * * * Accomplices are therefore of a tainted character, giving their testimony under the strongest motives to deceive."

Kracke testified that his purpose in assisting the complainant was to regain for the depositors the money out of which he had defrauded them. This statement is not entitled to credit in view of the transfer of his own property and the transfer of his father's property. It is evident from the whole case that his chief motive arises from his hope and expectation to keep out of the penitentiary where he so deservedly belongs at this time. The treatment shown him and the favors bestowed upon him are not calculated to induce him to speak the truth only, but rather to color his testimony in aid of the complainant's cause. The inducements are far too strong a temptation for a man of his moral dereliction to resist.

The decree of the chancellor should be sustained so far as it relates to the liability of the defendant Gus

Kracke and to the liability of those defendants who have been substituted herein for the defendant Henry Kracke. It cannot be sustained as to the other defendants. The cause is therefore reversed and remanded with directions to the chancellor to enter a decree in conformity with the views expressed in this opinion.

*Reversed and remanded with directions.*

MR. PRESIDING JUSTICE PARTLOW dissenting: I do not concur in the conclusions reached in this case. In my judgment the decree of the circuit court should be affirmed.