## Henry W. Ohlendorf, Receiver of Illinois State Bank of Crete, Appellee, v. James E. Bennett et al., Appellants.

### Gen. No. 7,378.

1. Parties—*defaulting cashier of bank as party to suit by receiver thereof against brokers to whom he paid bank's money in course of grain speculations.* A defaulting bank cashier was neither a necessary nor a proper party to a suit in equity by the receiver of the bank to recover from brokers moneys of the bank which such cashier had paid to them as losses and for margins in his grain speculations, where in a prior suit a decree had been entered against such cashier for the full amount of the money taken by him from the bank.

2. Equity—*want of jurisdiction of cause where jurisdiction dependent upon necessity of a discovery and an accounting as to improperly joined defendant.* Where a defaulting bank cashier was neither a necessary nor a proper party to a suit in equity by the receiver of such bank to recover from brokers the money of such bank which the cashier had paid to them for losses and as margins in his grain speculations, on the ground that in a prior suit such cashier had made a full discovery and an accounting upon which a decree had been entered against him for the full amount he had taken from such bank, equity was without jurisdiction of the cause so far as jurisdiction depended upon the necessity of a discovery and an accounting by such cashier.

3. Discovery—*right of equity to compel discovery under bill charging criminal acts on part of defendants.* Where a bill to recover from brokers moneys of a bank paid to them by a defaulting bank cashier included charge of a criminal offense on the part of such brokers, equity was without jurisdiction to compel a discovery from such brokers.

4. Equity—*when jurisdiction properly taken of suit by receiver to recover moneys of bank paid to brokers by defaulting cashier for losses and as margins in his grain speculations, notwithstanding remedy at law.* Equity held to have jurisdiction of a suit by the receiver of a bank to recover from brokers moneys of the bank paid to them by the defaulting cashier of such bank as losses and for margins in his grain speculations, upon the ground that complainant had no adequate remedy at law since the accounts involved were mutual, intricate and complex.

5. Equity—*when bill will be deemed to have been so amended as to include prayer for an accounting, notwithstanding absence of*

*actual interlineation pursuant to order of chancellor.* Where a suit in equity was tried by both parties upon the theory that an accounting was proper, although none was prayed in the bill, and the chancellor granted leave to complainant to so amend his bill before decree as to ask such accounting, the motion on that behalf having been made at the suggestion of the chancellor and granted over defendants' objection, the court, on review of a decree for complainant, will treat such amendment as having been made, notwithstanding there was no actual interlineation of the bill.

6. GAMBLING—*when grain speculations deemed gambling transactions in violation of Cahill's St. ch. 38, ¶¶ 308-310.* Evidence in a suit by the receiver of a bank to recover from brokers moneys of the bank paid to them by the defaulting cashier of such bank for losses and as margins in his grain speculations held to show that such transactions were gambling deals and inhibited by Cahill's St. ch. 38, ¶¶ 308-310.

7. LIMITATION OF ACTIONS—*applicability of statute where there is existing but inadequate remedy at law thereon.* In a suit by the receiver of a bank to recover moneys of the bank paid by a defaulting cashier of such bank to brokers for losses and as margins in his grain speculations, of which equity retained jurisdiction because of the inadequacy of the complainant's remedy at law in the circumstances, no recovery could be had as to claims based upon transactions antedating the suit by more than five years, except upon a showing of circumstances tolling the statute.

8. LIMITATION OF ACTIONS—*when statute begins to run against cause of action of receiver of bank to recover moneys taken from bank pursuant to criminal conspiracy.* Where in a suit by the receiver of a bank to recover moneys of the bank paid to brokers by a defaulting cashier of such bank for losses and as margins in his grain speculations, the evidence showed that the transactions were gambling deals inhibited by Cahill's St. ch. 38, ¶¶ 308-310, and likewise showed beyond a reasonable doubt that such brokers and such cashier were guilty, as charged in the bill, of a criminal conspiracy to rob the bank of such moneys, the statute of limitations did not begin to run against the right of the receiver to recover such moneys until the discovery of the conspiracy, or until such time as by reasonable diligence discovery thereof should have been made.

9. ACCOUNTING SUITS—*propriety of including interest in decree for receiver in suit to recover moneys of bank paid to participants in criminal conspiracy to rob bank.* In view of Cahill's St. ch. 74, ¶ 2, interest was properly allowed upon moneys of a bank paid to brokers by a defaulting cashier of such bank for losses and as margins in his grain speculations in the course of a conspiracy to rob

such bank of such moneys, as a part of the decree against such brokers in favor of the receiver of such bank for the moneys so received by them.

10. EQUITY—*when evidence insufficient to show release inuring to benefit of brokers sued by bank receiver for moneys of bank paid to them by defaulting cashier in course of grain speculations.* Evidence in a suit by the receiver of a bank to recover from brokers moneys of the bank paid to them by a defaulting cashier of such bank for losses and as margins in such cashier's grain speculations, held not to show that a depositor of such bank who became indebted to it through overdrafts permitted by such cashier was not a joint tort feasor with such cashier in respect of the moneys paid to such brokers so that a compromise settlement with such depositor for his liability to the bank operated to release such brokers.

11. EQUITY—*sufficiency of evidence in receiver's action to recover from brokers moneys of bank paid to them by defaulting cashier in course of grain speculations, to show right of defendants to credit for moneys refunded by third person.* Evidence in a suit by the receiver of a bank to recover moneys of the bank paid to brokers by a defaulting cashier of such bank for losses and as margins in such cashier's grain speculations held not to show that certain checks turned over to the bank by a third party went to replenish funds stolen from the bank by such cashier for payment to such brokers, so as to entitle defendants to credit therefor in determining their liability to complainant.

12. HARMLESS AND PREJUDICIAL ERROR—*statement of account by chancellor personally which should have been referred to master.* Where a chancellor has seen fit to state an account in a suit pending before him, and has done so with substantial accuracy, the decree based upon such accounting will not be reversed solely upon the ground that in so doing the chancellor has departed from the approved procedure of referring such matters to a master.

Appeal by defendants from the Circuit Court of Will county; the Hon. FREDERICK A. HILL, Judge, presiding. Heard in this court at the April term, 1924. Affirmed in part, reversed in part and cause remanded to restate account. Opinion filed September 2, 1926.

MOSES, ROSENTHAL & KENNEDY and DONOVAN, BRAY & GRAY, for appellants; WALTER BACHRACH and WALTER H. MOSES, of counsel.

CHARLES S. DENEEN, ROY MASSENA and W. D. HEISE, for appellee.

MR. JUSTICE JONES delivered the opinion of the court.

This is an appeal from a decree of the circuit court of Will county directing appellants to pay appellee, receiver of the Illinois State Bank of Crete, $76,030.55. The receiver filed a bill in chancery against James E. Bennett, Frank A. Miller and Frank J. Saibert, as individuals and as copartners, doing business under the firm name of James E. Bennett & Company, and Gustav H. Kracke. In *Ohlendorf v. Rathje*, 230 Ill. App. 427, we set out at length a sorry story of a bank failure in a small town, which was brought about through speculations of the bank's cashier on the Chicago Board of Trade. In that suit an effort was made to recover the bank's losses from its directors, who were charged with negligent performance of their duties. In this suit it is sought to recover money which Kracke wrongfully withdrew from the bank and turned over to Bennett & Company as margins and losses in his speculations.

The original bill was filed September 6, 1921, and charged that the defendants constituting the firm of Bennett & Company and the cashier, Kracke, entered into a conspiracy to rob the bank of its money, and pursuant to such conspiracy Kracke robbed it of large sums aggregating $130,000 and gave them to Bennett & Company without the knowledge or consent of the banking corporation; that Bennett & Company are members of the Chicago Board of Trade; that the money so turned over to them by Kracke was lost by him in gambling deals on the differences in the price of grain and other commodities; that Kracke was the custodian of the funds of the bank and as such occupied a fiduciary relationship; that a discovery and an accounting is necessary because the defendants are in

possession of documentary evidences which are necessary to prove the charges of the bill; that the account is intricate, complex and difficult, involving the use of documentary evidence, not in the possession of the complainant, and which cannot be obtained by him, and that it is of such complexity and intricacy it cannot be taken properly by a court of law.    The prayer of the bill was consistent with the allegations.    Appellants, as individuals and as copartners, demurred to the bill on the ground that it charged certain criminal offenses against them, and, therefore, no discovery from them could be compelled.    Judge Dibell, who heard the arguments, sustained the demurrer.    The bill was then amended so as to charge the necessity of a discovery and accounting as against Kracke alone.    Kracke answered, admitting most of its allegations, but denied the existence of the conspiracy and alleged that he was entitled to certain credits.    Appellants again demurred.    Judge DeSelm passed upon and overruled the demurrer.    Answers were thereupon filed by appellants denying the various charges made against them; denying the jurisdiction of the court because, as they allege, an adequate remedy at law exists, and interposing a number of other defenses, which we will mention later in this opinion.

Equity jurisdiction has been challenged both by demurrer and answer, because, it is claimed, that an adequate remedy at law exists and the bill contains no specific allegations of fact sufficient to clothe a court of equity with jurisdiction.    A bill of complaint should allege the specific facts showing the complication of the account which makes the remedy at law inadequate, and where conclusions of fact alone are pleaded, the bill is the subject of demurrer.    If the demurrer is overruled the defendant may either stand by his demurrer or plead over.    He cannot do both.    If he pleads over he abandons his objections to the sufficiency of the

bill and makes his objection a matter of defense, which will be decided on the proof showing the necessity for a resort to equity. If the proof shows the necessity, the court will retain jurisdiction to grant relief notwithstanding the bill contains allegations which are conclusions of facts, rather than allegations of specific facts upon which the conclusions are based.

It is necessary for us to determine at the outset whether or not chancery has jurisdiction of this cause. Testimony was heard before the chancellor in open court and he held that Kracke was neither a necessary nor a proper party to the suit because a decree had been rendered in *Ohlendorf v. Rathje, supra,* against him for the entire amount of money stolen by him from the bank, and that he had made full discovery to the receiver and that no other or further discovery or accounting could be required of him. In this holding of the chancellor we fully agree. Therefore the proceeding may be considered as though it had been brought against the members of the firm of Bennett & Company alone. We also concur in Judge Dibell's ruling that the bill charges criminal offenses against the appellants and that they cannot be compelled under the constitution to make a discovery concerning matters involving such charges. Chancery has no jurisdiction in this cause either to compel an accounting from Kracke or a discovery from appellants.

In support of chancery jurisdiction, appellee urges that (a) the transactions, in which the money was lost, were violations against the Criminal Code and under the provisions of section 132 of that Code [Cahill's St. ch. 38, ¶ 310], recovery may be had in a court of chancery; (b) the cashier and the brokers were co-conspirators and a court of equity has extensive powers in matters involving fraud; (c) a trust or fiduciary relationship is involved for the alleged reason that Kracke as the cashier under the circumstances sur-

rounding the conduct of the bank was a trustee of its funds, and that equity will follow the funds into the hands of others who did not acquire title to them in good faith and impress them with the trust; and (d) the accounts are mutual, intricate and complex so that adequate relief at law is not obtainable.

This proceeding is for the recovery of a money decree. Such being the case, resort must be had to a suit at law, unless there are considerations involved which make the remedy at law inadequate. While controversies involving a violation of the Criminal Code against gaming, and transactions involving fraud and fiduciary relationships are often the subject of equity jurisdiction, still, if the proceeding is for money only and the law affords an adequate remedy, the suit must be brought at law, notwithstanding it may involve gambling transactions, fiduciary relationships, conspiracies and fraud. Some special and substantial ground of equitable jurisdiction must exist in order to deprive a court of law of its jurisdiction. (*Toledo, St. L. & N. O. R. Co. v. St. Louis & O. R. Co.*, 208 Ill. 623.) Where a court of law is competent to afford an adequate and ample remedy, courts of equity will remit the parties to the courts of law, where the right of trial by jury is secured to them. In such cases either party has a right to demand that the matter of the defendant's liability be submitted to a jury according to the course of the common law, and unless some special and substantial ground of equity jurisdiction be alleged, and, if necessary, proved, such as that a lien exists for a money demand which cannot be adequately enforced at law, or that discovery is necessary to a recovery by complainant, or other like equitable considerations affecting the adequacy of the remedy at law, courts of equity will decline to interfere. (*Cook County v. Davis*, 143 Ill. 151.) Even if Kracke stole the money from the bank and gambled it off with Ben-

nett & Company, or even if he entered into a conspiracy with them to rob the bank and did rob it, or even if he was acting in a fiduciary relationship with respect to the funds at the time he stole them, or even if all of these situations existed in combination, a suit for the recovery of the money must be brought at law, unless there also exists some special and substantial ground of equitable jurisdiction. A defendant has a constitutional right to a trial by jury, unless to give it to him would deprive his adversary of a substantial right because of the inadequacy of the remedy offered by the law. And in this case we have reached the conclusion that there is nothing in the pleadings and nothing in the proof concerning conspiracy, fraud, gaming or fiduciary relationship sufficient to entitle the complainant to relief in equity. If equity has jurisdiction, it is upon another ground. The chancellor reached the same conclusion, and held that because of the complex and intricate accounts involved, a special ground for equitable relief presented itself and he retained jurisdiction of the cause for the purpose of entering the decree.

Appellants deny the necessity of resort to equity on that ground and say that section 68 of the Practice Act [Cahill's St. ch. 110, ¶ 68] affords the means for complete relief in this case, at law. It provides that all actions in which matters of account are in controversy may, by order of the court, be referred to some competent person as a referee to state and report an account between the parties and the amount that may be due from either party to the other, which report, when confirmed by the court, shall be final and conclusive between the parties and judgment may be entered thereon; but either party may, within ten days after notice of the filing of the report, file exceptions thereto and demand a trial by jury and upon such trial the report of the referee shall be prima facie evidence

of all the facts so found and reported. This statute has been declared constitutional in *Continental Beer Pump & Plumbing Co. v. Geo. J. Cooke Co.,* 299 Ill. 104. It was enacted in aid of the jurisdiction of courts in the action of assumpsit and other common-law actions which involve questions of account. While such remedial statutes have been enacted for the better examination of complicated accounts at law, and such fact should be considered in determining whether a court of equity should decree an accounting solely on the ground that the accounts are complicated, still they do not take away the jurisdiction of equity in cases of complicated accounts. (1 C. J. 619.)

No one can doubt the jurisdiction of a court at law in the instant case. The only right equity has to assume jurisdiction over it is on the ground that a full and complete remedy is not afforded by an action at law. Appellants undertake to give the case an appearance of simplicity by saying that the payments to them were made by four drafts drawn by the Illinois State Bank of Crete upon the National City Bank of Chicago, fifteen drafts drawn by the Illinois State Bank of Crete upon the Chicago City Bank & Trust Co., one other draft of the Illinois State Bank of Crete drawn on the Chicago City Bank & Trust Co., twenty-nine checks and ten deposit slips. In our judgment such an enumeration of items furnishes no fair estimate of the complexities and intricacies to be encountered in determining the account between appellants and appellee. In order to fix appellants' liability under the bill, it was necessary to first show that the money represented by the items mentioned was stolen from the bank and turned over to appellants. Kracke was not only speculating on the Board of Trade through Bennett & Company but also through a number of other brokerage concerns. The means employed by him in filching money from the bank were many and devious. His

falsifications and alteration of records and documents ran through almost all of the books and records of the bank. It required a complete audit of such books and records, accompanied by explanations only obtainable through testimony of Kracke to arrive at a determination of appellants' liability.

How the question of complexity and intricacy of the account impressed the chancellor is best evidenced by what he said upon that subject in his written opinion, filed in the case. His language upon that subject is as follows: "In order to establish the amount of money which Kracke extracted from the assets of the Crete Bank and paid to Bennett & Company in the various transactions in which they were engaged, it was necessary to introduce a large number of checks and drafts, and to show that these payments were made upon the Seggebruch & Company account, as distinguished from the Seggebruch account; and for other reasons it became necessary also to offer in evidence a large part of the books and records of the Crete Bank; and to ascertain finally what portions of these payments should be chargeable to Bennett & Company requires a careful analysis and examination of the various entries in the books and records, by comparison with checks and drafts evidencing the payments. In order that the court might get an intelligent understanding of these matters, it has been necessary to examine the checks and drafts and the indorsements thereon, to make exhaustive notes and memoranda, checking each check and draft with the entries in the books and records of the bank, and with the explanations of Kracke with reference thereto. And it would seem that it would be wholly impracticable for a jury to carry all these matters in their minds and arrive at any intelligent conclusion as to the total amount properly chargeable to Bennett & Company. For these reasons it would seem clear that although the checks and drafts

in themselves might be just as readily proven and offered in evidence in an action at law before a jury, still when we consider the extent to which the other books and documents and records of the bank are involved in an intelligent understanding of the transactions, it may well be said that the evidence is of such an intricate, complex and difficult character as to require the employment of those methods of investigation peculiar to courts of equity, and to justify a court of equity in taking jurisdiction of the case.''

This court can readily appreciate the accuracy of the chancellor's finding upon this question. When we considered the case of *Ohlendorf v. Rathje, supra,* we had before us many of the same exhibits which were before the chancellor in the instant case. They were voluminous and in addition to that they contained secret marks and symbols employed by Kracke as an aid to him in remembering the device he used in manipulating and juggling the accounts of the bank. They were of such a character that they baffled and deceived the bank examiners and the audit committee. There was no key to their solution. There was no means available for their interpretation except that furnished by Kracke. They presented a condition which would mystify any jury. The record in this case shows that the difficulties of proof concerning these books and records were the same as in the former case. It is clear to us that only the methods of investigation peculiar to courts of equity could solve the problem of determining an exact account. We are of the view that the jurisdiction of equity in this case is obvious. But if there be any doubt about it, the chancellor, under the circumstances before him, was vested with a sound discretion in determining the question of jurisdiction. (*Hartford Fire Ins. Co. v. Ledford,* 151 Ill. App. 413; *Billboard Pub. Co. v. McCarahan,* 151 Ill. App. 227; *Crown Coal & Tow Co. v. Thomas,* 177 Ill. 534; *Des*

*Moines Life Ins. Co. v. Seifert,* 112 Ill. App. 277; *Forster, Waterbury & Co. v. Webster Mfg. Co.,* 108 Ill. App. 41.) We are convinced there was no abuse of discretion on the part of the chancellor in deciding the question of jurisdiction raised by the answer in favor of appellee. Because of our holding that no adequate remedy at law exists, it is unnecessary for us to discuss other grounds which appellee insists are sufficient to give a court of equity jurisdiction of this cause. But in order that the parties may understand our attitude we expressly state that, as applied to this case, inadequacy of remedy at law is the only ground urged by appellee sufficient to clothe a court of equity with jurisdiction.

It is said that there can be no accounting against anyone because the amended bill asks for a discovery and accounting against Kracke only and not against appellants and that the chancellor found that Kracke was neither a necessary nor a proper party because a decree had already been entered against him in the *Rathje* case. There is no doubt that relief must be granted upon the theory of the bill or not at all. (*Chicago, P. & St. L. R. Co. v. Jacksonville Railway & Light Co.,* 245 Ill. 155. It is evident that if no accounting was asked for as against appellants none could be had against anyone. This anomaly presented itself to the chancellor at the time he decided the case and he expressed the view that although an account might be taken under the general prayer for relief contained in the bill, yet, good pleading required a specific prayer for it and remarked that: ''In view, therefore, of the fact that the case has been tried by both parties on the theory that the accounting was proper, I will permit complainant, if he shall be so advised, to amend his bill before decree is entered by inserting after the word 'thereof' on the 17th line of the 14th page of the amended bill, the words 'that an account may be taken

by or under the direction of this Honorable Court as to all of said transactions.' '' This amendment was not in fact made either by interlineation or by the filing of a separate paper. However, the parties treated the amendment as having been actually made and proceeded to a decree with that understanding. The decree contains a recital showing the motion to amend after such suggestion had been made by the court, and the granting of leave to amend over the objection of defendants. An agreement was then entered into of record that the several answers to the bill as so amended shall stand, to wit, in its present form. It is a general rule that obtaining leave to amend is not tantamount to an actual amendment, but in *Hinchcliffe v. Wenig Teaming Co.*, 274 Ill. 417, it is said: "Where there is an order granting leave to amend and the subsequent proceedings in the cause are based upon the assumption that the amendment has been made, the course is to consider the order as standing for the amendment itself. Where a motion to amend has been granted but no amended pleading appears in the judgment roll, it may be treated, on appeal, as if actually made." Under the circumstances here set forth we are constrained to treat the proposed amendment as though it had been actually made according to the rules of pleading, and to hold that relief is obtainable under the bill as amended if the allegations are sufficiently supported by the proof.

Having decided that equity has jurisdiction of this cause, we must determine the other questions presented. Counsel for appellants argue that the proof does not show the transactions between Bennett & Company and Kracke were in violation of the Criminal Code. It needs but a brief recital of the facts to disclose that the transactions were gambling deals. According to the evidence, appellants have been engaged in the brokerage business upon the Chicago Board of

Trade for a number of years and have transacted a tremendous volume of business in Chicago, and numerous other cities and towns throughout the states of this union. Their knowledge and acquaintance with people and with the methods employed in doing business on the Board of Trade were extensive and intimate. Kracke was a young man of limited business experience. He was made the cashier of a bank located in a small village with a capital stock of $25,000. About the only tangible property he possessed was a one-half interest in the premises in which he lived. The value of all of his property at the time he began trading was not in excess of $10,000. He never received a salary of over $125 a month. He had a wife and child to support. When his business relations with Bennett & Company began, he was in mental distress, because he had permitted William Seggebruch, also a resident of the village of Crete, to largely overdraw his account at the bank for money used in Board of Trade operations. Kracke testified that in order to restore funds to the bank which he had permitted William Seggebruch to withdraw, he began to buy and sell grain on the Chicago Board of Trade through Bennett & Company and other brokers under the name of William Seggebruch & Company. His dealings were mainly carried on with appellants through their branch office at Chicago Heights, conducted by S. E. Fisher, local manager for appellants. Kracke's trading was extensive. During the World's War, the government put a limit upon the number of bushels of certain grains which could be traded in. Kracke frequently had deals which involved the limit. He never delivered a bushel of grain that he sold, or received a bushel of grain that he bought. He testified that he had no warehouse or elevator in which he could receive any commodity purchased by him and that he never owned any grain which he could have delivered on any of his contracts.

He knew that there was a rule which provided that in the event a deal was not closed within a specified time he could be called upon to deliver the grain sold by him or to receive the grain bought by him. He testified, however, that he never expected to deliver or to receive any grain upon his contracts. Fisher, the agent for Bennett & Company, testified that he never expected him either to deliver or to receive the grain. He was continually buying and selling in quantities which represented a value far in excess of his financial worth. All of these things were as well known to one party as to the other. The circumstances are not disputed or contradicted by any testimony in the case.

The parties stipulated that Fisher, as manager of the branch office at Chicago Heights, was authorized to act in the conduct of all lawful transactions in said city. Appellants now contend that this stipulation estops appellee from imputing the knowledge which Fisher obtained in the transaction of his unlawful business with Kracke to his principals, Bennett & Company. The stipulation does not amount to an agreement that the transactions were not gambling deals and if appellants' contention is sound, then every bucket-shop keeper can escape liability under the Criminal Code by proving he had instructed his agent not to gamble or engage in any unlawful enterprise. Fisher's knowledge was imputable to appellants. But, even if it were not, appellants had actual knowledge of these circumstances. Under a long line of decisions the transactions in question must be held to have been gambling deals and inhibited by sections 130-132 of the Criminal Code [Cahill's St. ch. 38, ¶¶ 308-310]. (*First Nat. Bank of El Paso v. Miller*, 235 Ill. 135; *Pratt & Co. v. Ashmore*, 224 Ill. 587; *Pope v. Hanke*, 155 Ill. 617; *Pardridge v. Cutler*, 168 Ill. 504; *Weare Commission Co. v. People*, 209 Ill. 528; *Pelouze v. Slaughter*, 241 Ill. 215; *Kempton Farmers' Elevator*

*Co. v. James E. Bennett & Co.,* 233 Ill. App. 655, abst.)

The answer of appellants sets up the statute of limitations as to all claims against them which were incurred more than five years prior to the filing of the bill of complaint. The chancellor held that the statute applied, and the decree rendered herein is for the liability of appellants incurred subsequently to September 6, 1916. Appellee has assigned cross error upon such ruling and urges that it is inequitable under the circumstances of this case to interpose it as a defense and that it was tolled through the fraud, criminal conduct and concealment of appellants. While courts of equity in some cases ignore the statute of limitations because it is purely legal as distinguished from an equitable defense (*Evans v. Moore,* 247 Ill. 60), we doubt if such action is ever taken in any case except one in which equity has exclusive jurisdiction. (*Harding v. Durand,* 138 Ill. 515.) The rule is, that when courts of equity have concurrent jurisdiction with courts of law and the party proceeds in equity, if barred at law, he will also be barred in equity. (*Hawley v. Simons,* 157 Ill. 218, p. 224; *Lancaster v. Springer,* 239 Ill. 472; *Gordon v. Johnson,* 186 Ill. 18.) We have already said that the jurisdiction of a court at law in this case is unquestioned and that a court of equity also has jurisdiction because of the inadequacy of the legal remedy. It follows then that unless the statute was tolled no recovery can be had for any liability which was incurred prior to September 6, 1916.

Recovery can be had in this case for moneys received by appellants in their gambling transactions with Kracke without regard to whether a criminal conspiracy to rob the bank existed or not. But appellants claim that in order to toll the statute of limitations, the conspiracy to rob must be proved as alleged, and it must also be shown that their wrongdoing was intentionally and actively concealed by them from

the bank. The chancellor found that no such criminal conspiracy existed and that the statute was not tolled. Appellee has assigned cross error as to this holding. We fail to see what difference it makes as to the application of the statute whether the alleged conspiracy was proven or not. Appellants were guilty of gambling with the bank's employee and of thereby obtaining its funds. If the proof shows that they had sufficient knowledge to apprize them that he was stealing and concealing the fact from the bank, can it be said that the statute of limitations will protect them because they were not also in a conspiracy to rob? It seems to us that it makes no difference what crime or crimes were availed of by appellants to get the money. If they got it by gaming or theft or both, knowing that it belonged to the bank, and actively concealed the fact from the bank, certainly the statute was tolled until a discovery of the loss.

The proof of the alleged conspiracy consists to a considerable degree of the same facts and circumstances which both the trial court and this court hold clearly establish the guilt of appellants of the criminal offense of gambling. But there are additional facts and circumstances in evidence which are material and pertinent to the issue. To establish the charge against appellants of criminal conspiracy to rob, it must be shown that the accused were guilty of the crime charged not merely by a preponderance of the evidence, but beyond a reasonable doubt, just as in a criminal proceeding. (*McInturff v. Insurance Co. of North America,* 248 Ill. 92; *People v. Sullivan,* 218 Ill. 419; *Germania Fire Ins. Co. v. Klewer,* 129 Ill. 599.)

A summing up of the proofs pertaining to the charge of conspiracy shows that when Kracke became the cashier of the Illinois State Bank of Crete, William Seggebruch was an active speculator on the Chicago Board of Trade, and was trading under three different

names, to wit, William Seggebruch, William Segge-
bruch & Company and The Crete Grain Company.
He possessed a stronger personality than Kracke and
induced the latter to permit him to overdraw his ac-
counts in the bank. So large were these overdrafts
that Kracke became frightened, and in order to con-
ceal the condition of the bank and of Seggebruch's ac-
counts he began tampering with the books and records
of the bank. It will serve no useful purpose to again
recite the methods employed by Kracke in extracting
money from the bank as well as from other sources to
carry on grain speculations. He claims that he began
speculating for the sole purpose of replenishing the
funds of the bank which had been stolen by him in aid
of Seggebruch's accounts. His deals were inten-
tionally concealed from the bank and the public. He
operated under the name of Seggebruch & Company
in an account known upon the books of Bennett & Com-
pany as No. 3105. Seggebruch carried on his specula-
tions with Bennett & Company through the account
of William Seggebruch, known on the books of said
brokers as No. 3100. The record shows that Segge-
bruch was well acquainted with appellants and that
Kracke was acquainted with none of them, until after
he began dealing in the grain market. Seggebruch
informed Bennett & Company that Kracke was cashier
of the Illinois State Bank of Crete and that he was
not worth to exceed $10,000. The evidence discloses
beyond any doubt that in the early stages of Kracke's
speculations appellants were fully informed as to who
he was, his occupation and his financial condition.
This information furnished them with actual and posi-
tive proof of the credit to which he was entitled.
With this knowledge they permitted him to embark
upon an extensive course of speculation far beyond
any limit which they might reasonably permit him to
go. They had no branch office in Crete, but conducted

one nearby in Chicago Heights, managed by Fisher as heretofore mentioned. Kracke usually placed his orders for purchases and sales with Fisher by telephone. The bank's telephone was on a party line and conversation over it could be listened in on by all other subscribers on that line. This matter was talked over between Kracke and Fisher and the bank's telephone was taken off of the party line and established on an individual line. The monthly charges to subscribers on individual lines were greater than on party lines. Kracke did not want the bank directors to know of the change and Fisher agreed to take care of the additional monthly charges. Thereafter Fisher paid such additional charges and itemized the same in his monthly statements of expense to Bennett & Company, sent to Chicago to the principal office of appellants. Kracke's speculations were generally not successful and to recoup his losses he plunged more heavily. It was not an infrequent thing for him to buy through Bennett & Company 200,000 bushels of grain. He was compelled to margin these purchases to the extent sometimes of 5c a bushel. It will thus be seen that to margin a single deal of that size it would require $10,000 in cash, a sum equivalent to what appellants knew to be Kracke's entire worth without excepting his legal exemptions. Sometimes he had as much as 250,000 bushels of grain. As a rule when he won anything the winnings were credited to the account of Seggebruch & Company upon balances due from him. He was the largest trader at the Chicago Heights office. Fisher testified that his business was equivalent to that of all other business of the office. His trading was so active and his losing so consistent that Bennett & Company was continually calling upon him to cover losses or to put up more margins. His losses during the years he traded with Bennett & Company were known to appellants to be more than ten times

the value of his entire estate. The No. 3100 account was a purely criminal enterprise as was also the No. 3105 account. The undisputed evidence shows that Bennett & Company received from Kracke between $130,000 and $150,000. Not all of this was allowed by the chancellor for the reason that he held that a portion of it could not be recovered because of the statute of limitations interposed by appellants. Appellee claims that the losses to Bennett & Company were $87,000 more or a total of over $200,000 and his claim is supported by the testimony of Kracke and not contradicted by anyone. The chancellor refused to allow the claim of $87,000 because the testimony of Kracke was uncorroborated as to it, and, being an accomplice, his testimony was tainted. The court was justified, for that reason, in rejecting the claim for the additional sum; but the fact remains, that in considering the question of appellants' knowledge of Kracke's guilt, the payment of $130,000 to them has as much probative force as the payment of $200,000.

The conclusion from the evidence that Bennett & Company knew Kracke was a thief is inescapable. They had full, complete and actual knowledge all the time that he had only $10,000 worth of property; that he had only a little position in a country bank; that when they called upon him for margins he had to produce the money without delay; and that they often called upon him daily for money aggregating $1,000 or more. Fisher admitted he knew Kracke was stealing money from the bank. The proof shows that appellants had actual knowledge of the payment of margins and losses. They cashed the major portion of the drafts and checks. They were in touch with every essential detail of the gambling transactions. Indeed, the facts and the circumstances surrounding the situation were sufficient to have made it obvious to anyone acquainted with them that the money was being stolen. No amount of credulity would have pre-

vented such belief. Nor could there be any doubt that it was being stolen from the State Bank of Crete. We need cite but a few instances of the proof to firmly establish these propositions. For example: payments by Kracke on the William Seggebruch & Company account, No. 3105, were generally made by drafts payable to William Seggebruch and indorsed by him, or by checks upon the State Bank of Crete, signed by William Seggebruch and payable to appellants. On July 13, 1916, Kracke as cashier issued five separate drafts for $1,000 drawn on the National City Bank of Chicago, the correspondent bank of the Illinois State Bank of Crete, payable to William Seggebruch and indorsed by him. These drafts were turned over to Fisher by Kracke who requested Fisher to hold some of them a few days before presenting them, as the market might go up, and if it did it would not be necessary to cash them. Frequent requests of this kind with reference to other drafts were made. What difference did it make to the Crete Bank whether the drafts were cashed or not, if the money represented by them had not been stolen? What occasion can there be for holding up a draft if the bank is good and has sufficient funds on deposit with its correspondent bank? Manifestly, there is none. These requests to hold up drafts impugned the solvency of the bank and furnished proof that it was in a failing condition. Bennett & Company and their branch manager Fisher knew what was the cause of such condition. Evidently the market did not go up because the drafts being held until July 17 and 18 were cashed by appellants and bear their indorsement. The draft of July 8, 1916, for $2,000 was cashed on July 14. The draft of July 22, 1916, for $1,000, No. 26766, and draft No. 26756 of the same date for $1,000, did not go through the clearing house until August 2, 1916. Draft No. 26512 for $2,000 dated July 1, 1916, did not clear until July 7. These are only a few of many similar circumstances. Further

proof of appellants' knowledge where the money was coming from and of the bank's consequent tottering condition is found in the conduct of appellants themselves with reference to Kracke's request that the drafts be not presented for several days after their delivery. The five drafts issued July 13, 1916, and the three drafts issued July 17, 1916, were taken by appellants, after they received them, to the bank upon which they were drawn to be certified. Why this precaution? It may not be unusual to have an individual check certified by the bank upon which it was drawn. In some cases it is an ordinary precaution taken to obviate the hazard incident to the possible withdrawal of the maker's deposit or his insolvency. But is such a practice usual with bank drafts? Did appellants fear the insolvency of the Crete Bank and the withdrawal of their deposit accounts? Their conduct shows they had such a fear and it also shows what that fear was predicated upon. We have not undertaken to go through the long list of drafts to show the number of them that were certified. We have taken only a few and the ones we have mentioned are among those which were issued more than five years prior to the bringing of the suit and which are barred, if the statute of limitations has application. Our purpose in making such a selection is that they show conclusively the guilty knowledge of appellants at an early day in the period of Kracke's transactions with appellants. The total losses of Kracke in 1916 subsequently to September 6, as found by the chancellor, approximate $12,000 but the evidence shows, though not included in the chancellor's finding, that the losses of that year approximate $30,000. In 1917, they were more than $27,000 and in 1918, up to the time the bank was closed, and Kracke became a fugitive from justice, they were at least $15,000.

The chancellor found that in addition to the amount covered by drafts and checks, Kracke paid to James

E. Bennett & Company, through the local manager Fisher, $10,500 in cash. The finding was based upon the testimony of Kracke and Fisher as to such payments and upon the documentary evidence furnished by the records of the Commercial Bank of Chicago Heights showing the deposits of various cash payments to the credit of Bennett & Company. Fisher testified that the payments were generally made in amounts of $1,000 or $1,500 each; that while he occasionally received cash from other customers, they were in smaller amounts and he remembered no payment as large as $1,000 having been made by any other customer. The records of the Chicago Heights Bank show that seven deposits of $1,000, two deposits of $1,500 and one deposit of $500 were made on or after October 13, 1916. Fisher testified that when these cash payments were made to him they consisted of paper money done up in packages in $500 and $1,000 amounts in the manner in which paper money is often kept in banks. Fisher admitted that he was "leery" about where Kracke was obtaining money. This proof furnished him with sufficient evidence to warrant more than a suspicion.

Fisher severed his connection temporarily with Bennett & Company a short time before the bank was closed. A man by the name of Decker took his place at the Chicago Heights office. Kracke was indebted to Bennett & Company on his Seggebruch & Company account. Decker went to see him about it and Kracke gave him a deposit slip for $5,000 indicating that James E. Bennett & Company had on that day deposited with the Crete Bank and had to appellants' credit in that bank the sum of $5,000. The slip was delivered to Bennett & Company and was retained by that firm until some time later when Kracke took it up by payment upon his account with Bennett & Company. Appellants knew when they received the

deposit slip that they had made no deposit in the Crete Bank. They knew that Kracke had no money of his own to deposit to their credit. They never made any effort to withdraw the deposit by check or otherwise. They held the slip until it was convenient for Kracke to take it up. When he had paid them the amount shown on it, they surrendered it to him. The whole transaction shows that the slip was a device by which Kracke was using the bank to supply him with funds for the operation of his gambling deals with appellants. The issuance of the deposit slip necessarily required a falsification of the bank's books. This must have been as evident to appellants as it is to everyone else.

The proof demonstrates that appellants were gambling with Kracke and knew that he was losing large sums of money; that they had actual knowledge that he was stealing money with which to pay his losses; and that he was stealing it from the Illinois State Bank of Crete, by which he was employed.

It is claimed by appellants that the charge of conspiracy to rob is lacking in essential proof of an agreement and common design. It is not contended by appellee that a conspiracy existed between Kracke and appellants when the former began trading in the Seggebruch & Company account. Although he was then dishonest and was looting the bank, it is not claimed that appellants knew of it when their relations with him began. The knowledge of his dishonest conduct was not acquired by appellants until a later date. It is difficult to ascertain just when appellants learned with definiteness about Kracke's thefts and began participating in the fruits thereof. We are of the opinion that it was before January 1, 1915, but there can be no doubt that they knew it from July 9, 1915, at which time the telephone was changed. The question therefore is: Does the subsequent knowledge and partici-

pation of appellants in the dishonest conduct of Kracke make them guilty of a conspiracy to rob?

Bishop's New Criminal Law, vol. 2, sec. 171, defines a conspiracy as "the corrupt agreeing together of two or more persons to do by concerted action something unlawful either as a means or an end." The means to be employed to accomplish the unlawful purpose may never have been disclosed or may never have been agreed upon, so that they could not be stated, and yet the offense would be complete and might be proved by overt acts or other circumstances. *(People v. Blumenberg, 271 Ill. 180, p. 184.)* There never was a meeting between Kracke and appellants at which it was agreed or tacitly understood between them that they should enter into a joint enterprise for the robbery of the bank nor do we think that such a meeting was necessary to formulate an agreement. The gravamen of the offense is the combination, and the agreement or combination need not be evidenced by a writing. It may be a verbal agreement or it may be an undertaking or a scheme evidenced by the action of the parties. *(Harding v. American Glucose Co., 182 Ill. 551; Franklin Union, No. 4 v. People, 220 Ill. 355, p. 377.)*

In *United States v. Cassidy,* 67 Fed. 698, it is said that: "It is not necessary to constitute a conspiracy that two or more persons should meet together, and enter into an explicit or formal agreement for an unlawful scheme, or that they should directly, by words or in writing, state what the unlawful scheme was to be, and the details of the plan or means by which the unlawful combination was to be made effective. It is sufficient if two or more persons, in any manner, or through any contrivance, positively or tacitly come to a mutual understanding to accomplish a common and unlawful design. In other words, where an unlawful end is sought to be effected, and two or more

persons, actuated by the common purpose of accomplishing that end, work together, in any way, in furtherance of the unlawful scheme, every one of said persons becomes a member of the conspiracy, although the part he was to take * * * was to be executed at a remote distance from the other conspirators." A mere tacit understanding between conspirators to work to a common purpose is all that is essential to a guilty, actionable combination. *(Patnode v. Westenhaver,* 114 Wis. 460, p. 474.) It has been held in *Richards v. United States,* 175 Fed. 911, that where a conspiracy contemplates false or fraudulent entries, a party to it is chargeable with all the acts consummating it although not personally cognizant of all the details. An actual agreement in terms is unnecessary, it being sufficient if the alleged conspirators co-operated and pursued common designs. *(Spies v. People,* 122 Ill. 1.)

Mere knowledge or even approval of the unlawful acts of the conspirators without co-operation or agreement to co-operate with them is not enough to constitute one a party to the conspiracy. There must be an intentional participation in the transaction and in furtherance of the common design. *(People v. Strauch,* 240 Ill. 60.) But knowledge with participation makes the crime complete. We have not endeavored to discuss or even detail the guilty participation of Seggebruch and Fisher in the criminal conduct of Kracke. It is sufficient to say that counsel for both parties not only concede but charge such participation. No one can read the evidence in this case without reaching the conclusion that there was a common design among Kracke, Seggebruch and Fisher to maintain their gambling operations with the bank's money which was to be stolen by Kracke. This is an important landmark. We not only have the conspiracy among those three men to rob, but we have it virtually

admitted by the parties to the suit in their briefs. It is shown by the evidence that subsequent to the formation of the conspiracy and the performance of overt acts done in pursuance of it, appellants acquired actual knowledge of the thefts of the conspirator Kracke and of the purpose of the conspiracy. With this actual knowledge they participated in the means employed to effectuate the conspiracy. It must be remembered that all of these men were engaged in criminal acts of gambling and that the gambling was not done in order to rob the bank, but the bank was robbed in order that they might gamble. These facts bring this case within the rule laid down in *People v. Strauch, supra.* The Supreme Court in speaking of a given instruction on page 75 said: "That instruction tells the jury, as a matter of law, that all who take part in a conspiracy after it is formed and while it is in execution, and all who, with knowledge of the facts, concur in the plans originally formed and aid in executing them, are fellow-conspirators; that their concurrence, without proof of an agreement to concur, is conclusive against them; that they commit the offense when they become partners to the transaction or further the original plan.  *  *  *, the principal of the instruction has often been approved. In *Spies v. People, supra,* it was held that if one concur in a conspiracy no proof of agreement to concur is necessary. Such we understand to be the settled rule of law."

Squaring the undisputed proofs in the instant case with the test laid down in the above-mentioned rule, we discern that appellants, with full knowledge of Kracke's thievery, and of the unlawful combination in which he was associated, as well as the dishonest purposes of the combination, became partners in the transaction and aided in executing the common design of robbing the bank by receiving its money with the knowledge that it was stolen. The Supreme Court

said that such knowledge and such conduct is conclusive against them even without proof of an agreement to concur. We are not impressed by the argument that Kracke, Seggebruch and Fisher were conspirators, and that appellants were only innocent participants in the loot of the bank. In *Cooke v. People*, 134 Ill. App. 41 (aff'd 231 Ill. 9), it is held that where a new participant enters into a conspiratous combination he will be liable for all of the acts done in furtherance of the common design. It is immaterial to the existence of a common design to rob, what the several conspirators may have had in their minds with reference to a distribution of the stolen funds. If A, B, C and D enter into an agreement to blow a safe in order to obtain money with which to gamble among themselves, the conspiracy is not affected by the fact that it is the idea of each conspirator to win the other's share of the loot. The common design remained the same. It was to rob the safe.

The rule as to the quantum of proof necessary to sustain the charge of conspiracy to rob against appellants is no different from that necessary to sustain the charge of gambling. Both charges must be proven beyond a reasonable doubt. We apprehend that all courts would reach the conclusion that appellants were guilty of gambling as charged in the bill of complaint and we see no reason for a different conclusion in reference to the charge of conspiracy. That charge is supported by almost every fact which sustains the charge of gambling and by many other facts, a number of which we have mentioned in this opinion. There is no better basis for the argument that Bennett & Company did not have actual knowledge of the thefts than there is that they did not have actual knowledge that Kracke was gambling on the rise and fall of the grain market. If the crime of gambling is established, so is the crime of conspiracy.

By reason of the law and facts we must hold that the appellants were guilty of the conspiracy charged in the bill of complaint. That the thefts and defalcations of Kracke were concealed from the officers of the bank needs no discussion by us at this time. We have fully expressed our views in the *Rathje* case and we see no occasion at this time and under the facts in this case to change them. The bank's financial troubles burst upon the village of Crete like a thunderstorm. Kracke's concealment of his criminal acts had been as nearly perfect as crimes of such magnitude ever attain. Our findings that appellants had knowledge that the money they received from Kracke in gambling belonged to the bank, and that they participated in the conspiracy and in the concealment of the loss of the funds from the bank, make the statute of limitations without application and removes the bar. Where a cause arises from a fraud, the statute of limitations will not begin to run nor laches apply until the discovery of the fraud or from the time the fraud could have been discovered by the exercise of reasonable diligence. (*Farwell v. Great Western Tel. Co.,* 161 Ill. 592, p. 596, and cases cited.)

The chancellor allowed interest which appellants object to on the alleged ground that appellee's claim is unliquidated. Section 2, chap. 74 of the Revised Statutes [Cahill's St. ch. 74, ¶ 2] provides for the payment of interest at the rate of 5 per cent for money received for the use of another and retained without the owner's knowledge. We do not consider the account to be unliquidated. Outside of the single item of $5,000 which was paid Kracke on the account of Seggebruch & Company and which went to replenish the funds of the bank, the record does not disclose any other sum to which appellants are entitled to credit. The items which appellants received, so far as the findings of the chancellor are concerned, were in

definite specified amounts with absolute proof as to dates of payment. It would indeed be inequitable not to require interest to be paid on these several amounts. Counsel for appellee cite *Harvey v. Hamilton,* 54 Ill. App. 507; *Central Stock & Grain Exchange of Chicago v. Bendinger,* 109 Fed. 926; *Joslyn v. Downing, Hopkins & Co.,* 150 Fed. 317, in support of the chancellor's allowance of interest and we think they sustain it.

When the bank failed, William Seggebruch was indebted to it on the William Seggebruch and The Crete Garage accounts in excess of $100,000 by reason of overdrafts and other withdrawals. He effected a compromise of all his liabilities with the receiver and it is urged by appellants that the proof shows that he was jointly interested in the Seggebruch & Company account, and being a joint tort-feasor with Kracke, a settlement releasing him also released all other joint tort-feasors of their civil liability. We are convinced from the evidence that when Kracke began speculating he employed the William Seggebruch & Company account for his individual deals and that Seggebruch had no interest in them.

Appellants claim they are entitled to a credit of $34,231.36 on account of fourteen checks of Bennett & Company payable to William Seggebruch and which were turned over to the Crete Bank. They insist that these checks went to replenish the funds of the bank which had been stolen by Kracke. There is no dispute about the checks being used to replenish stolen funds, but the trouble with appellants' contention is, there is no proof that they went to replenish the funds stolen and used in the account of Seggebruch & Company with Bennett & Company. The only explanation offered was given by Kracke. He testified that they did not replenish funds stolen for the use of the Seggebruch & Company account, but were used for the purpose of replenishing other funds which he had hypothe-

cated for the benefit of William Seggebruch in the latter's individual deals. Under the circumstances, appellants are not entitled to such a credit.

Because of our holding that the directors were not guilty of negligence, the case of *Bartlett v. First Nat. Bank of Chicago*, 247 Ill. 490, has no application. And in view of our holding that appellants had actual knowledge of Kracke's crimes and participated in them, the case of *Murray v. Standard Pecan Co.*, 309 Ill. 226, has no application.

Appellants claim that it was error for the chancellor to state the account and cite *Barnes v. Barnes*, 282 Ill. 593, and *Carstens v. Reinecke*, 212 Ill. App. 555, in support of their position. There can be no doubt that both the Supreme and the Appellate Courts of this State have expressed themselves against the policy of the chancellor's stating an account. Such courts will no doubt continue to adhere to their view. But where a chancellor has seen fit to state the account himself and has done so with substantial accuracy, it would be folly to reverse a case upon that ground and direct the chancellor to cause the master to do something which has already been done by the chancellor.

We have reached the conclusion that appellants' liability, as stated by the chancellor and as found in the decree, is correct in so far as it covers the period after September 6, 1916. But the chancellor was in error in holding that appellants had not actively participated with Kracke in concealing from the bank the fact that they had received its funds from Kracke in gambling deals; that appellants were not co-conspirators with Kracke, and that the statute of limitations barred a recovery against appellants for claims arising on and prior to September 6, 1916. The decree is affirmed with respect to its findings and order against appellants in the sum of $76,030.50, but because of the errors above indicated, the cause is remanded to the circuit court of Will county with directions to re-

state the account so as to include such items, if any, as appellants are liable for from July 9, 1915, to September 6, 1916.

*Affirmed in part, reversed in part and cause remanded to restate account.*